## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| KANI LITTLE; HECTOR RAMOS; JAMES PATTERSON, on their own behalf and on behalf of all others similarly situated; | : : : | |
| | : | No. |
| Plaintiffs, | : : | |
| v. | : : | |
| DAUPHIN COUNTY; GREGORY BRIGGS, Warden of Dauphin County Prison, in his Individual Capacity; LIONEL PIERRE, Chief Deputy Warden, in his Individual Capacity; ROGER LUCAS, Custody Major, in his Individual Capacity; MARK SKELTON, Lieutenant, in his Individual Capacity; and JOHN DOES No. 1-12, in their Individual Capacities, | : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | | |

## COMPLAINT

### INTRODUCTION

1.      In late 2023, the prison officials in charge of Dauphin County Prison ("DCP") believed they had a problem: incarcerated people in the prison's restricted housing units were allegedly smoking synthetic marijuana.

2.      To the extent that was true, it was principally because prison staff brought contraband into the facility, in violation of the law and the terms of their employment.

3.      Rather than root out corruption among their own staff through proper supervision and discipline, prison officials got angry.

1

4.      They lashed out with an escalating campaign of collective punishment against the incarcerated people for whose well-being they are responsible.

5.      People in the restricted housing units were already living under inhumane conditions, with severely limited socialization, outside contact, and exercise.

6.      Defendants sought to squeeze them into submission by systematically depriving them of what little else they had.

7.      Defendants confiscated legal paperwork, cut off communication with loved ones on the outside, and deprived people of basic necessities from toilet paper to showers to religious texts.

8.      In winter weather, they cut the power, shut the heat, and stripped people of any clothing warmer than a t-shirt.

9.      They lied to the public about what they were doing and launched an internal snitch hunt to figure out which incarcerated people were telling the outside world the truth.

10.     In at least one instance, correctional officers physically assaulted an incarcerated person who spoke out against this mistreatment to make an example of him.

11.     Because of this campaign of collective punishment, dozens of incarcerated people lived in a state of near-total deprivation for weeks.

12.     They lived in frigid darkness, unable to see the food and medicine they were ingesting, to bathe themselves properly, to participate in their own legal defense, or to pray as their consciences demanded.

13.     Most of the people subjected to this campaign of collective punishment were, on information and belief, pretrial detainees, who are presumed innocent and cannot lawfully be punished except through certain constitutionally prescribed procedures.

14.    By attempting to break the will of a group of already deprived people with a punitive campaign of near-total deprivation, Defendants violated the Constitution.

15.    This lawsuit seeks accountability for Defendants' unlawful and inhumane acts.

## JURSIDICTION AND VENUE

16.    This action is brought under 42 U.S.C. § 1983 and the First, Eighth, and Fourteenth Amendment of the United States Constitution; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("RA").

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

18.    Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

19.    Plaintiff Kani Little is currently held pre-trial at Franklin County Jail. Prior to his March 2024 transfer, he was held at DCP for 15 months beginning from December 19, 2022, and spent approximately three months on Blocks P-6 and P-3 of DCP. Mr. Little suffers from anxiety and depression.

20.    Plaintiff Hector Ramos was released from FCI Schuylkill on August 24, 2024, and is presently at liberty. Prior to his prison sentence, he was held at DCP from October 18, 2023, through January 10, 2024. He was held in Block P-6 of the RHU from October 27, 2023, through January 10, 2024. Mr. Ramos suffers from schizophrenia and depression.

21.     Plaintiff James Patterson is currently incarcerated at SCI Rockview. Prior to his transfer, he was held at DCP for 55 months and specifically on Block P-6 from November 16, 2023, through April 20, 2024.

22.     Defendant Dauphin County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Dauphin County is in possession and control of DCP.

23.     Defendant Gregory Briggs is Warden of DCP and as such is responsible for the overall operations at the jail, including inmate discipline and use of solitary confinement, ensuring adequate staffing, staff training, delivery of mental health care, security and use of force policies and practices, and ensuring accommodations for incarcerated people with psychiatric disabilities. He is sued in his individual capacity.

24.     Defendant Lionel Pierre is Chief Deputy Warden of Security at DCP and as such is responsible for overseeing facility operations, including the use of solitary confinement, ensuring safety and security to incarcerated persons, and supervising and ensuring adequate staffing. Defendant Pierre was also involved in the December 2023 assault against Plaintiff Little. He is sued in his individual capacity.

25.     Defendant Roger Lucas is a Custody Major at DCP and was employed in this role during Plaintiff Little's period of detention at DCP. Defendant Lucas was involved in the December 2023 assault against Plaintiff Little. He is sued in his individual capacity.

26.     Defendant Mark Skelton is a Lieutenant at DCP and was employed in this role during Plaintiff Little's period of detention at DCP. Defendant Skelton was involved in the December 2023 assault against Plaintiff Little, overseeing the correctional emergency response

team ("CERT") and responsible for authorizing the use of mace spray. He is sued in his

individual capacity.

27.     Defendants John Does #1-12 are DCP correctional staff members who engaged in

the December 2023 assault against Plaintiff Little. They are sued in their individual capacities.

**JURY DEMAND**

28.     Plaintiffs demand a jury trial.

**STATEMENT OF FACTS**

   **a. Dauphin County Prison**

29.     Dauphin County Prison is located in Swatara Township and houses a jail

population of over 1,000 people.

30.     The majority of individuals incarcerated at DCP are there pre-trial. Some are

serving short prison sentences.

31.     The Dauphin County government includes a County Jail Oversight Board ("the

Board") composed of nine members who provide for the "safekeeping" and "discipline" of

inmates and "management of the correctional institution." 61 Pa.C.S. § 1731(a)(3).

32.     The Board is responsible for appointing the warden of DCP and approving

appointments to the position of deputy warden.

33.     The Board supervises the warden.

34.     The Board is the final municipal policymaker for Dauphin County for matters of

prison management and administration.

35.     DCP has a widespread and well-earned reputation as a troubled prison facility.

36.     More than 20 people have died in custody at DCP since the beginning of 2019.[1]

37.     The potential role of DCP staff in many of these deaths have been inadequately investigated or outright whitewashed.

38.     DCP has disproportionately high rates of overdoses in custody.

39.     DCP has infestations of roaches and rodents, including in food service and food preparation areas.[2]

40.     People detained at DCP are routinely denied outdoor recreation; on Labor Day 2024, DCP boasted that it was able to get almost the entire population of the facility outside for the first time in decades.[3]

41.     In the judgment of at least one prison expert, DCP has "more problems than comparable facilities."[4]

42.     In recent years, DCP has experienced serious issues with drugs entering the prison.

43.     DCP has implemented several measures to address the issue.

44.     For example, in 2021, DCP hired a third-party company to process and scan personal mail outside of the facility and upload electronic copies to the incarcerated person's tablet.

---

[1]     Joshua Vaughn, *Coroner Rulings Obscure Role of Violence in Dauphin County Jail Deaths, Report Says*, PennLive, Jun. 27, 2024, https://www.pennlive.com/news/2024/06/coroner-rulings-obscure-role-of-violence-in-dauphin-county-jail-deaths-report-says.html.

[2]     Joshua Vaughn, *Dauphin County Cut Power to Men in Jail's 'Hole' for 2 Weeks: 'Darkness Creates Depression,'* PennLive, Mar. 13, 2024, https://www.pennlive.com/news/2024/03/dauphin-county-cut-power-to-men-in-jails-hole-for-2-weeks-darkness-creates-depression.html.

[3]     Elise Person, *Dauphin County Prison Gets Almost All Inmates Outside for the First Time in Decades*, CBS 21, Sept. 5, 2024, https://local21news.com/news/local/dauphin-county-prison-gets-almost-all-inmates-outside-for-the-first-time-in-decades.

[4]     Seth Kaplan, *Prison Expert: Problematic Evidence 'Tells You There Is Something Going On' at Dauphin County Prison*, ABC 27, Apr. 1, 2024, https://www.abc27.com/news/prison-expert-problematic-evidence-tells-you-there-is-something-going-on-at-dauphin-county-prison.

45.    DCP also has a longstanding practice of prohibiting in-person contact during visitation: A thick clear wall separates incarcerated persons from their loved ones, requiring them to speak with each other via two-way telephones.

46.    Even with those measures, Defendant Warden Briggs has been unable to get the drug issue at DCP under control.

47.    The reason is that the principal source of drugs and other contraband in the prison is DCP's own staff.

### b.  The Risks and Harms of Solitary Confinement

48.    Solitary confinement has well-documented adverse psychological effects, particularly when imposed for prolonged periods.

49.    The isolation inherent to solitary confinement deprives people of critical social interactions, in addition to pre-existing restrictions on movement, natural light, and fresh air. This results in sensory deprivation and the inability to engage in meaningful activities.

50.    Research has shown that individuals subjected to extended isolation experience heightened levels of anxiety, depression, insomnia, confusion, withdrawal, and other severe mental health issues, including hallucinations, paranoia, psychosis, and suicidality.

51.    Prolonged isolation can lead to a decline in cognitive function, since human brains are designed for social interaction. Over time, people may exhibit memory problems, difficulty concentrating, and impaired decision-making abilities.

52.    Research also shows that people held in isolation are at risk of physiological consequences, such as severe headaches; heart palpitations and increased heart rate; chest, abdominal, neck, and back pain; problems with digestion, diarrhea, and weight loss; loss of appetite; and dizziness and fainting.

53.    These impairments begin to manifest within days of isolation and can persist even after individuals are released from solitary confinement.

54.    Individuals with pre-existing mental health conditions are particularly vulnerable to the harms of solitary confinement. Isolation can aggravate symptoms of conditions such as schizophrenia, bipolar disorder, and post-traumatic stress disorder (PTSD).

55.    For people with mental health conditions, isolation "can be as clinically distressing as physical torture."[5]

56.    Various human rights bodies, including the United Nations, have raised concerns regarding the use of solitary confinement for periods exceeding 15 days, classifying such conditions as torture or other ill-treatment. For example, the 2011 Report of The Special Rapporteur On Torture And Other Cruel, Inhuman Or Degrading Treatment Or Punishment determined that isolation for more than 15 days should be prohibited entirely.

57.    Additionally, in 2015, the U.N. General Assembly revised its Standard Minimum Rules for the Treatment of Prisoners (renamed the "Mandela Rules") to forbid indefinite or prolonged use of isolation (defined as anything more than 15 consecutive days) and further restrict its use for people with mental or physical disabilities.[6]

58.    The Mandela Rules also emphasize that solitary confinement should never be used as a form of punishment.

---

[5]    Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. of Psychiatry & L. 104, 104 (2010).

[6]    United Nations General Assembly, *United Nations Standard Minimum Rules for the Treatment of Prisoners, A/RES/70/175*, Dec. 17, 2015, at 14, https://www.unodc.org/documents/justice-andprison-reform/Nelson_Mandela_Rules-E-ebook.pdf.

### c.  The Restricted Housing Unit at Dauphin County Prison

59.    The Restricted Housing Unit (RHU) at DCP is a designated section within the facility housing incarcerated persons who are in administrative custody.

60.    Persons may be held in administrative custody for a variety of reasons, such as pending investigation of a rules violation, for medical observation and treatment, or if a person or staff member believes it to be necessary for their safety.

61.    At the relevant time in question, the general population disciplinary custody section of the RHU consisted of three sub-basement units on P-Block, specifically designated as P-3, P-5, and P-6.

62.    At the time in question, the maximum capacity of the RHU was 62 persons.

63.    Persons placed in the RHU are subject to various forms of isolation and are deprived of privileges granted to the general population of the jail.

64.    For example, people held in the RHU are not allowed to have calls or receive visitation from friends or family members—only legal calls and visitation are permitted.

65.    Furthermore, in the RHU, only one cell is allowed out at a time, resulting in the only social interaction possible being between oneself and their cellmate.

### d.  Defendants Begin Their Campaign of Punishment with Deprivation of Tablets

66.    In November 2023, Defendants began an escalating campaign of punishment in response to reports of alleged widespread smoking, including of synthetic marijuana, by people housed in the RHU.

67.    On or around November 16, 2023, in a coordinated action, DCP staff seized the tablet of anyone held on RHU Blocks P-3, P-5, and P-6.

68.     On information and belief, Defendants Warden Briggs and Deputy Warden Pierre directed DCP staff to seize the tablets and were fully aware of the operation.

69.      Without tablets, everyone on P-3, P-5, and P-6 was left without any access to religious texts, law library, inmate handbooks, phone calls, or any incoming mail, including legal mail.

70.     This is because people incarcerated at DCP are not allowed any physical reading materials. All mail is scanned in and only accessible via tablet.

71.     The confiscation of the tablets thus shut down all communications for anyone held on the RHU, who, as a result, were unable to contact anyone outside of the facility.

72.     Similarly, any reading materials and the majority of programming, such as mental health resources, are only available via the tablets distributed by DCP.

73.     As a result, the confiscation of all tablets also took away any ability for RHU inhabitants to read or complete programming, including recreational, mental health, educational, or law library materials.

74.     Finally, the confiscation of tablets removed an inhabitant's ability to practice religion, as all religious texts, including the Bible, the Quran, prayer guidance, and other critical materials, are only available via tablet access.

75.     The length of time it took for individuals to have their tablets returned to them varied, based on how long people had to spend in the hole, when they arrived at the RHU, and the availability of tablets when they were released back into the general population.

76.     At a minimum, tablets were withheld for at least 6 weeks. In some cases, people were deprived of tablets for up to three months, even after they returned to general population housing.

### e. Deprivation of All Personal Belongings & Legal Paperwork

77.     On or around November 21, 2023, in a coordinated action, all cells on P-3, P-5, and P-6 were searched and all personal belongings were seized without confiscation slips.

78.     On information and belief, Defendants Warden Briggs and Deputy Warden Pierre directed staff to conduct the search and seizure and were fully aware of the plan before it occurred.

79.     Items seized included all hygiene products (including toilet paper, soap, toothpaste, contact solution and cases, deodorant, lotion, shampoo, conditioner, baby powder, and hair combs), legal paperwork, writing materials, extra clothing (including thermals), sneakers, sheets, pillows, and blankets.

80.     After this search, people held on the RHU were only allowed to have a single, standard issue short-sleeve uniform, one pair of boxers, and one pair of shower slides.

81.     Following the seizure of all personal belongings, people held on the RHU had extremely limited access to hygiene products for the following month.

82.     Some eventually received indigent grade soap, toothbrush and toothpaste, the quality of which was far lower than that available for purchase from commissary.

83.     Others did not receive a toothbrush or toothpaste at all.

84.     Toilet paper was handed out on a limited basis—each cell would only receive one roll per week, which was insufficient for the use of two people.

85.     When asked for more toilet paper, correctional officers would either hand out individual sheets or say there was no toilet paper left to hand out.

86.     The lack of sufficient, basic hygiene products contributed to the deterioration of RHU inhabitants' personal hygiene.

87.     Additionally, the complete deprivation of any writing utensils meant that for approximately one month, people were unable to put in any grievances, sick calls, or request slips.

88.     Many never received any of these seized belongings back, which also resulted in the permanent loss of their legal paperwork.

### f.  Deprivation of Showers & Recreational Time

89.     Following the seizure of all personal belongings on November 23, 2023, people held on the RHU were not let out of their cells at all for approximately ten  days. There was no recreational time nor was anyone let out to shower.

90.     Prior to this, persons held at DCP were generally granted one hour of recreational time per day out of their cells.

91.     On information and belief, Defendants Warden Briggs and Deputy Warden Pierre approved this change in policy on recreational time and shower access.

92.     After the week-long bar on showers, person held at the RHU were eventually granted a 15-minute period to shower every three days.

93.     Despite having this limited access to showers, individuals held at the RHU were hardly able to get clean. Black mold caked the shower curtains and the tiles of the shower walls and floors. Fruit flies infested the drains, which were so clogged up that individuals often stood in pools of their own dirty water while they bathed.

94.     Other than this 15-minute shower period, people held on the RHU were entirely confined to their cells.

95.     This miniscule shower window had a detrimental effect on people's personal hygiene, especially in conjunction with the lack of sufficient hygiene products.

96.     For about a month, there was no recreation time allowed whatsoever.

97.     Without any recreation period, people were confined to their cell areas for almost 72-hour periods at a time, with only approximately a half hour per week outside of their cells. In other words, over a month-long period, people were only allowed out of their cells for a cumulative two hours maximum.

98.     Without any recreation period, people held on the RHU had no access to any communal cleaning supplies, such as mops, rags, or cleaning agents to clean their cells, since these were only communally available during recreational time.

### g.  Deprivation of Heat and Light

99.     On or around December 2, 2023, Defendants ordered that all electrical power be cut off to RHU units P-3, P-5, and P-6.

100.    Correctional officers told people held on P-6 that the order to cut power had come directly from Warden Briggs.

101.    On information and belief, Defendant Deputy Warden Pierre participated in, was fully aware of, and agreed with Defendant Warden Briggs's decision to cut the power.

102.    Acting on Defendants' directive, maintenance staff cut off the power from a circuit breaker, so correctional officers were unable to turn the lights or heat back on even if they wanted to.

103.    Pennsylvania state law requires that county correctional institutions have "an emergency backup system … available and in operational condition." 37 PA § 95.248(8).

104.    Pennsylvania state law also requires that county correctional institutions at minimum provide adequate housing that includes heating, artificial light sufficient "to read or

work without injury to eyesight," sufficient toilet facilities, and bathing facilities. 37 PA § 95.226.

105.    However, the power to the RHU at DCP remained shut off from approximately December 2, 2023 to December 19, 2023—a period of about two and a half weeks.

106.    DCP cut off all electricity and heat to the RHU units in winter-like conditions.

107.    During that period, temperatures regularly dropped below freezing, to as low as 24 degrees Fahrenheit.[7]

108.    On top of there being no heat, the ventilation fan remained on and would regularly blow in cold air from outside.

109.    Because DCP had previously seized all sheets, pillows, and long-sleeved clothing, people on the RHU had no effective way to insulate their bodies from the cold.

110.    Staff only distributed one or two blankets to each person. Besides this, the plastic mattresses in each cell were entirely bare.

111.    Some resorted to cutting open their mattresses and swaddling themselves in them for warmth.

112.    Additionally, without any electricity at that time of year, people held on the RHU lived in near-total darkness.

113.    P-3, P-5, and P-6 are basement level floors, and cells only have a small, skinny window that allows in light from outside.

114.    People lived in darkness for at least 14 hours a day and had limited visibility during daylight hours, with people squinting just to see in their cells.

---

[7] https://www.wunderground.com/history/daily/us/pa/middletown/KMDT/date/2023-12-16

115.    The cumulative effect of extreme darkness and cold took physical and mental tolls on people.

116.    Many experienced constant shivering, runny noses, cramping, loss of feeling in extremities, and difficulty sleeping from the cold.

117.    The lack of light also contributed to people's irregular sleeping, disorientation, and lethargy.

118.    Because of the limited visibility, people held on the RHU were unable to inspect their food, which regularly contained bugs, shells, hair, or other debris.

119.    As a result, on information and belief, many consumed unsanitary or unsafe food.

120.    During the blackout period, DCP also shut off water access to the RHU for several day-long periods at a time.

121.    Without water access, people were unable to use their sinks or flush their toilets.

122.    Consequently, people were unable to wash their hands or themselves and human feces festered in the toilet. They were forced to sleep, eat meals, and spend their entire days in cells with dirty toilets.

123.    In theory, water was only available to drink when correctional officers distributed meals twice per day. In reality, however, DCP staff frequently failed to distribute water during mealtimes, citing issues with the kitchen's supply.

124.    As such, individuals were often forced to drink filthy, unhygienic water from their sinks. Meanwhile, when the water was shut off for entire days at a time, individuals had no access to drinking water at all.

125.    Throughout the duration of these blackout conditions, medication rounds came inconsistently or at the wrong time intervals, resulting in missed dosages.

126.    In order to receive regular medication, people held in the RHU must wait for nurses to come by to administer said treatment.

127.    Prior to the blackout, there was a morning round around 7:00 a.m. and an evening round around 7:00 p.m.

128.    However, following the power cut, medication did not come by at scheduled intervals.

129.    Sometimes nurses would not distribute medication at all or medication would be distributed hours late, with the evening round arriving as late as 2:00 a.m. instead of 7:00 p.m.

130.    When medication was distributed, it was also given out in total darkness, so that people were unable to confirm that they were taking the prescribed medication or dosage.

131.    The cumulative effect of these deprivations deteriorated people's mental and physical health, exacerbating feelings of helplessness, isolation, depression, anger, stress, panic, and suicidal ideation.

## Class Representatives

*Kani Little*

132.    Kani Little is twenty-seven years old and has been incarcerated for approximately two years.

133.    Mr. Little has been diagnosed with depression and anxiety since at least 2022. To treat these conditions, he is prescribed two different medications.

134.    Mr. Little is a devout and practicing Christian. His religious practice includes praying and reading scripture on a daily basis.

135.    In October 2023, Mr. Little was sent to Block P-6 of the RHU following a vent malfunction caused by the cell below.

136.    After being held on P-6 for three weeks, Mr. Little had his tablet seized during the first shakedown. He was deprived of any tablet access for a period of approximately three months.

137.    Without tablet access, Mr. Little was unable to practice his Christianity, because it is the only way to access the Bible or other prayer guidances, and DCP does not offer any in-person church or chaplain services.

138.    Being deprived of a tablet also resulted in Mr. Little's inability to access the law library, initiate communication with his attorney, or contact any loved ones for weeks.

139.    During the second seizure of all personal belongings, Mr. Little had many items taken, including multiple bottles of shampoo, lotion, soaps, thermals, long johns, socks, and t-shirts, all of which he had purchased from commissary.

140.    Mr. Little also had all legal work seized from him, including any mail that his criminal defense attorney had sent him, research from the law library, legal documents that he brought from upstate, educational legal materials he was studying, and his law dictionary.

141.    Mr. Little was never given any confiscation slips for the seizure of any of these personal belongings or legal work.

142.    Out of all of this seized property, the only items that were eventually returned to Mr. Little were his sheets and his slippers. The remainder of his belongings were permanently confiscated.

143.    For approximately a week and a half following the seizure of all his personal belongings, Mr. Little was not granted any shower access whatsoever.

144.    Mr. Little also experienced several days without any toilet paper or soap.

145.    As a result of this deprivation, in tandem with the denial of any spare clothing or laundry service, Mr. Little's uniform became so soiled that his clothes turned brown.

146.    Due to the freezing temperatures, Mr. Little experienced constant shivering, numbness, loss of feeling in his fingers and toes, joint aches, and muscle cramping.

147.    At the time of the blackout, Mr. Little was prescribed two different medications for his mental health conditions. Without the proper timing and dosages of these prescriptions, he would be unable to sleep.

148.    During the blackout, DCP staff did not administer Mr. Little's psychiatric medications consistently.

149.    The lack of critical medication, on top of the conditions of pervasive darkness and freezing temperatures, greatly dysregulated Mr. Little's ability to sleep.

150.    As a result of the conditions on P-6, Mr. Little's mental health, anxiety, and depression worsened. He experienced pervasive feelings of despair, hopelessness, and anger.

151.    Following the power cut and confiscation of all personal belongings, Mr. Little attempted to get the attention of guards, who largely remained on the bubble. He did so by covering the window of his cell and banging on the door, which should prompt a guard to check on him as a safety measure.

152.    Despite Mr. Little's verbal requests for the lights and heat to be restored and his property be returned, he was told by guards that there was nothing they could do to change the dire conditions on P-6.

153.    On or around December 8, 2023, Mr. Little was being escorted back to his cell on P-6 after seeing the medical unit.

154.    This was the most time Mr. Little was able to speak with a guard since the blackout on P-6 had commenced. Mr. Little again advocated on behalf of himself and other persons held on P-6 regarding the extreme deprivations they were suffering.

155.    While being escorted, Mr. Little's hands were handcuffed to a belt around his waist, restricting his freedom of movement and ability to balance.

156.    When the guard and Mr. Little returned to P-6 and were in front of his cell, Mr. Little refused to lock in, out of protest of the blackout conditions on P-6.

157.    In response, the escorting guard told Mr. Little that he would go check with the guard stationed on the bubble, to see if anything could be done.

158.    After the escorting guard left, Mr. Little remained alone and handcuffed on the tier, outside of his cell.

159.    Following this, Lieutenant Mark Skelton approached the door to P-6 along with a search team, Custody Major Roger Lucas,  and Deputy Warden Lionel Pierre.

160.    These DCP staff talked through the window to Mr. Little and the rest of the block. Mr. Little echoed the block's complaints about the blackout conditions and asked if anything could change. This request was denied by the staff present.

161.    Mr. Little then asked if the lights could at least be turned on; this request was also denied.

162.    Following this conversation, DCP staff asked Mr. Little's cellmate to go back into their cell. They separately asked Mr. Little to remain outside of his cell, face the back wall of the tier and get on his knees.

163.    Mr. Little, who remained handcuffed to the belt around his waist, proceeded to go to the back wall but did not get on his knees.

164.    Approximately twelve guards in riot gear—Defendants John Does #1-12—then stormed into P-6 and physically assaulted Mr. Little, smacking him with a riot shield before picking him up and slamming him onto the ground.

165.    After he was slammed to the ground, Mr. Little lost consciousness. He woke up to guards carrying him out of the unit, with mace sprayed on his face and his hands still cuffed around his waist.

166.    This assault was in full view and earshot of the entire tier on Block P-6, including in view of the correctional officers in the bubble.

167.    The assault occurred in the presence of and in the view of Defendants Pierre, Lucas, and Skelton, none of whom took any action to intercede or otherwise prevent the assault.

168.    Guards carried Mr. Little to Block P-3, where they finally removed his handcuffs and instructed him to strip.

169.    After Mr. Little complied, they continued to physically assault him, punching Mr. Little, tasing his face and chest, and kneeing him in the head.

170.    One guard grabbed Mr. Little by the arm and forced him to lie on his back, before Lieutenant Skelton sprayed mace directly in Mr. Little's face again. A guard then continued to rub the mace further into Mr. Little's face, shoving the chemical agent into Mr. Little's eyes and nose.

171.    Multiple guards were restraining Mr. Little by sitting on him, while proceeding to punch and elbow him.

172.    Defendants Lucas and Pierre were present on Block P-3 during this second assault as well, but still took no action to intercede or otherwise prevent the assault,

173. Following this second assault, guards put Mr. Little in a chair and wheeled him into segregation, a unit of cells isolated behind the kitchens at DCP.

174. Mr. Little suffered from multiple knots on his head, including a particularly large one on the right side of his head. Additionally, his lip was swollen and bleeding, and his chest and ribs suffered from extensive bruising.

175. A nurse attended to Mr. Little immediately after the assault, but only put Nasaline in his eyes and did not otherwise treat Mr. Little's injuries, despite witnessing his bloodied face and being told about his headache.

176. Mr. Little never received any further medical treatment for these injuries.

177. To this day, Mr. Little continues to experience episodes of twitching in his neck and hands, which he suspects to be the result of nerve damage from the assault.

178. After being held in the segregation cells for approximately two weeks, Mr. Little was sent back to P-6 for the remainder of his RHU sanction.

179. Mr. Little filed two grievances regarding his treatment, but did not receive any conclusive response until March 2024, nearly five months later.

180. Mr. Little filed his first grievance near the end of November, approximately two days after all his personal belongings were seized. This grievance centered on his personal property, including his legal work and tablet, being confiscated.

181. The second grievance Mr. Little filed was in early December and reiterated his claims regarding the property seizure, along with the power being cut. DCP deemed this second grievance as unnecessary since Mr. Little's first grievance was already submitted.

182.    The response Mr. Little received in March denied his grievance, claiming that it was not a "grievable issue". By this point, Mr. Little had already been transferred to Franklin County Jail for his safety.

*Hector Ramos*

183.    Hector Ramos is thirty-eight years old and was incarcerated at DCP for approximately three months. He spent nearly the entirety of his time at DCP on Block P-6.

184.    Mr. Ramos has been diagnosed with schizophrenia and depression since 2011. He has consistently received medication to treat these conditions, including while incarcerated at DCP.

185.    Mr. Ramos has been a Christian since he was a young child. His religious practice involves a daily practice of reading scripture, praying, and listening to sermons.

186.     On or around October 27, 2023, Mr. Ramos was transferred to Block P-6 of the RHU.

187.    When DCP seized everyone's tablets in November, Mr. Ramos had yet to receive a tablet at all.

188.    Prior to this, Mr. Ramos had put in request slips for a tablet, but DCP's only answer was that there were not enough tablets and that he had to wait for Global Tel Link ("GTL") staff to arrive in order to receive one.

189.    When the mass deprivation of tablets occurred in the RHU, Mr. Ramos was precluded from receiving a tablet and thus subject to this deprivation as well.

190.    Without a tablet, Mr. Ramos was unable to access any religious materials, self-help programs, or law library or message with his loved ones.

191.    In total, Mr. Ramos was deprived of tablet access from his arrival at DCP all the way until the end of December, a period of approximately two months.

192.    On or around November 21, 2023, CERT came into Mr. Ramos's cell and took all writing materials, pencils, pieces of paper, legal mail and legal work.

193.    This rendered Mr. Ramos completely unable to create notes or write letters to his family or his attorney, shutting down any ability to communicate with the outside world.

194.    In the days prior to the seizure, Mr. Ramos wrote a letter to his wife, Sylvia Morales, alerting her to the increasingly abysmal conditions of the RHU.

195.    Upon receiving the letter, Ms. Morales contacted Bruce LeValley, DCP's then-Director of Administration. Mr. LeValley promised to investigate the issues and follow up with Ms. Morales about her concerns. However, Mr. LeValley did not contact Ms. Morales again.

196.    In addition to confiscating writing materials and forcing Mr. Ramos into further isolation from his family and friends, CERT also confiscated all of Mr. Ramos's spare clothing, including undershirts, underwear, thermals, socks, and sneakers.

197.    After this, the only remaining clothing in Mr. Ramos's possession was a standard short-sleeve jumpsuit, one pair of boxers, one pair of socks, and shower slippers.

198.    All of Mr. Ramos's commissary hygiene products were seized as well. Afterwards, DCP staff gave one state-issued, indigent toothpaste, one toothbrush, and one bar of soap to Mr. Ramos. These were all inferior quality to the comparable products he had previously purchased from commissary.

199.    When Mr. Ramos ran out of soap and toothpaste and asked for more, DCP staff told him that they did not have any more to distribute to him.

200.    As a result, Mr. Ramos went two weeks without being able to brush his teeth properly, and a week entirely without soap.

201.    During this period, staff would also deny Mr. Ramos additional toilet paper, similarly citing that there was none left to hand out. At one point, Mr. Ramos went nearly two weeks without any toilet paper.

202.    This collectively contributed to the deterioration of Mr. Ramos's personal hygiene, which was so inferior that his entire cell stank, and he constantly felt filthy.

203.    Mr. Ramos's sheets were seized during the shakedown as well, leaving him with only two blankets for warmth in the freezing temperatures. Besides the blankets, all that remained in Mr. Ramos's cell was a metal desk and a metal bed with a bare mattress.

204.    Following the power cut and heat shutoff, Mr. Ramos did his best to keep warm in the freezing temperatures by moving around and performing jumping jacks.

205.    Out of desperation, Mr. Ramos went so far as to cut open his mattress, ripping off the plastic cover and swaddling his body inside of the insulation.

206.    Despite these measures, the cold deeply affected Mr. Ramos's ability to sleep because he was so freezing. He experienced constant shivering, numbness, and muscle cramping.

207.    During the blackout, the water to Mr. Ramos's cell was cut at least two times.

208.    While the water was cut, Mr. Ramos was unable to use his sink or flush his toilet. Additionally, staff did not pass out any water to relieve Mr. Ramos's thirst.

209.    As a result, Mr. Ramos would go entire days without being able to drink any water.

210.    DCP staff would also conduct strip searches of Mr. Ramos and other individuals in RHU. Some staff impermissibly kept their body cameras on when conducting the searches, further adding to the dehumanization experienced by Mr. Ramos.

211.    Mr. Ramos also did not receive his medication regularly during the blackout.

212.    At the time, Mr. Ramos was prescribed Remeron in the evenings to address his schizophrenia and depression.

213.    However, due to missed pill calls, Mr. Ramos would go several nights without any medication whatsoever.

214.    Without his dosages, Mr. Ramos was entirely unable to sleep and suffered from cold sweats, racing thoughts, and anxiety.

215.    The dire conditions on P-6 resulted in Mr. Ramos's physical suffering, and a rapid deterioration of his emotional and mental health. Mr. Ramos experienced pervasive feelings of worthlessness, abandonment, depression, and paranoia. He sincerely believed that he was not going to leave DCP alive and thought about taking his own life.

216.    Mr. Ramos filed a grievance on December 6, 2023, specifically in regard to the seizure of all of his personal property, including his legal mail.

217.    In early January 2024, DCP requested Mr. Ramos be more specific in his grievance and he refiled the paperwork.

218.    Mr. Ramos did not receive a response to his grievance until January 24, 2024. By that point, Mr. Ramos had already been transferred to FCI Schuylkill. Due to his transfer, the final response to Mr. Ramos's grievance was mailed to his family's residence.

219.    In their answer, DCP claimed that Mr. Ramos's complaint was a non-grievable issue due to the "security of the institution tak[ing] precedence."

220.    They additionally responded that "All tablets and property were returned after property was inventoried, and conditions were improved and secure."

_James Patterson_

221.    James Patterson is thirty-three years old and was incarcerated at DCP from 2019 until 2024. During the last five months he spent at DCP, Mr. Patterson was held on Block P-6 of the RHU.

222.    Mr. Patterson is a devout and practicing Christian. As part of his faith, he regularly reads the Bible and engages in prayer upon waking and before meals.

223.    Mr. Patterson's tablet was seized, along with everyone else's on P-6, on or about November 16, 2023. He was deprived of tablet access for a little over one month until approximately December 19, 2023.

224.    Without a tablet, Mr. Patterson was unable to access any religious services, including any ability to read scripture or follow prayer guidance.

225.    Mr. Patterson was also deprived of educational materials, such as history, science, and mathematical courses that Mr. Patterson regularly accessed via tablet to keep his mind engaged.

226.    Without a tablet, Mr. Patterson was additionally prevented from accessing the law library or receiving any letters or emails from his attorney.

227.    Because of this, Mr. Patterson was unable to contact his attorney for at least a month.

228.    During this period, Mr. Patterson was in the midst of the sentencing process and his attorney needed to contact him in relation to a Pre-Sentencing Investigation (PSI).

229.    After the blackout, Mr. Patterson discovered that his attorney had arrived in person to DCP and been denied any in person legal visits during the blackout. As a result, his attorney had to reschedule at least one meeting with the prosecutor in Mr. Patterson's case.

230.    During the second shakedown five days later, all of Mr. Patterson's legal documents were seized by correctional officer Luis Rodriguez. This included all legal mail, case notes and documents, as well as any writing materials such as envelopes, pen, and paper.

231.    Mr. Patterson was not given any confiscation slips when those items were taken.

232.    To this day, Mr. Patterson has yet to have any of these legal documents returned to his possession.

233.    In addition to his legal work, Mr. Patterson had all his hygiene products, including his deodorant, lotion, Vaseline, hair comb, pick, contact saline solution, contact lenses case, nail clipper, razor, and toothbrush taken without confiscation slips.

234.    For three weeks, Mr. Patterson was entirely deprived of hygiene products, including no access to a toothbrush or toothpaste whatsoever.

235.    After all personal belongings were seized, Mr. Patterson and his cellmate were given a single roll of toilet paper.

236.    When they ran out, only one of the correctional officers would distribute toilet paper when asked. This same officer informed Mr. Patterson that correctional officers were given direct orders instructing them not to distribute any toilet paper.

237.    Because Mr. Patterson's contact solution and cases were seized, his only resort was to sleep in his contacts, resulting in eye strain, dryness, and discomfort.

238.    Only after the blackout ceased did Mr. Patterson have his hygiene products returned to him, on or around December 19, 2023.

239.    All of Mr. Patterson's spare clothing was seized as well, including t-shirts, thermal layers, and shoes. Following the confiscation, he was left with a single, short sleeved uniform, one pair of socks, one pair of boxers, and slides.

240.    Following the seizure, Mr. Patterson was also deprived of any sheets or pillows. Only a bare mattress and a single blanket remained in his cell.

241.    When the heat was cut, Mr. Patterson cut open his mattress and climbed inside the insulation to get warm, attempting to lay as still as possible to preserve his body heat.

242.    Out of desperation, Mr. Patterson also tried to use what little toilet paper he had to stuff the vents, in an effort to lessen the freezing air that was blasting into his cell.

243.    Despite these measures, Mr. Patterson suffered from freezing temperatures, experiencing constant shivering, numbness, loss of feeling in his fingers and toes, joint aches, and muscle cramping.

244.    This was compounded by the fact that Mr. Patterson has experienced past physical injuries in his hips, knees, and shoulders, which were particularly aggravated.

245.    Due to the lack of light, Mr. Patterson also found himself constantly squinting and further straining his eyes. This persisted even during the limited daylight hours, because his cell window did little to nothing to illuminate the cell.

246.    The combination of freezing temperatures and near constant darkness severely disrupted Mr. Patterson's sleep, due to his miserable physical conditions and lack of ability to orient himself in time.

247.    During this period, Mr. Patterson also experienced water shutoffs in his cell, which would persist for a day at a time. When this occurred, Mr. Patterson was deprived of any running water in his cell and unable to wash himself, flush the toilet, or hydrate.

248.    The cumulative result of these conditions made Mr. Patterson's mental health deteriorate drastically. His anxiety was through the roof, he was unable to think straight, and he was scared to eat his food.

249.    Following the blackout, Mr. Patterson contacted medical services at DCP regarding his feelings of anxiety, which he had not struggled with prior to being subjected to the conditions giving rise to this lawsuit.

250.    Mr. Patterson submitted at least two grievances in relation to various aspects of the blackout conditions. One grievance was about the electricity being cut and living in darkness, and the other focused on his legal mail being stolen and attorney being prevented from visiting.

251.    Mr. Patterson received these responses after approximately two months, during which time he filed multiple request slips asking for updates on the grievances. They were ultimately rejected.

252.    In one of his grievances, Mr. Patterson explicitly named Officer Rodriguez as the person who seized all his legal documents.

253.    Officer Rodriguez then proceeded to retaliate against Mr. Patterson, trying to prevent Mr. Patterson's access to recreational time and in one instance, cuffing Mr. Patterson so aggressively that he injured his shoulder.

## CLASS ALLEGATIONS

254.    Plaintiffs bring this action on behalf of, and seek certification of, the following class of persons ("the Class") under Federal Rule of Civil Procedure 23(b)(3): all persons confined at Dauphin County Prison in units P-3, P-5, and/or P-6 of the Restricted Housing Unit at any point from November 16, 2023, to December 19, 2023 (the "Class Period").

255.    In addition and/or in the alternative, Plaintiffs bring this action on behalf of, and seek certification of pursuant to Federal Rule of Civil Procedure 23(b)(3) and (c)(5), one or more of the following subclasses of the Class: (i) all members of the Class whose federal constitutional claims concerning their deprivation of basic needs during the Class Period arise under the Fourteenth Amendment, including pretrial detainees (the "Fourteenth Amendment Subclass"); (ii) all members of the Class whose federal constitutional claims concerning their deprivation of basic needs during the Class Period arise under the Eighth Amendment, including sentenced prisoners (the "Eighth Amendment Subclass"); (iii) all members of the Class who had a diagnosed mental health condition reflected in their official DCP records during the Class Period (the "Mental Health Subclass").

256.    Upon information and belief, the Class and Subclasses are so numerous that joinder of all members is impractical, as the RHU has a residential capacity of up to 62 individuals at any given time and was mostly full during the relevant period.

257.    There are questions of law or fact common to the Class and/or the Subclasses, including but not limited to:

a.    Whether class members were deprived of access to tablets during the relevant period, and if so by whom and why;

b.    Whether any such deprivation of access to tablets deprived class members of materials necessary to freely exercise their religious beliefs;

c.    Whether class members were deprived of personal belongings and legal paperwork during the relevant time period, and if so by whom and why;

    d.   Whether class members were deprived of nearly all out-of-cell time, including restricted access to showers and recreation during the relevant period, and if so by whom and why;

    e.   Whether class members were deprived of light and heat during the relevant time period, and if so by whom and why;

    f.   Whether any or all of the foregoing deprivations were punitive in their intent;

    g.   Whether any or all of the foregoing deprivations were reasonable in light of a legitimate governmental interest;

    h.   Whether any or all of the foregoing deprivations violated the Due Process Clause of the Fourteenth Amendment and/or the Eighth Amendment;

    i.   Whether any or all of the foregoing deprivations had the effect of discriminating against the Mental Health Subclass in violation of the Rehabilitation Act and/or Americans with Disabilities Act;

    j.   Whether any or all of the foregoing deprivations deprived class members of their First Amendment right to freely exercise their religion;

    k.   Whether any or all of the foregoing deprivations violated the Religious Land Use and Institutionalized Persons Act by depriving class members of their right to freely exercise their religion;

    l.   Whether the Dauphin County Prison Board authorized or ratified Defendant Warden Briggs's and/or Defendant Deputy Warden Pierre's conduct;

258.    Plaintiffs' claims are typical of the claims of the Class and/or Subclasses, as Plaintiffs were housed in the RHU during the relevant time period and subject to all of the

alleged deprivations giving rise to class members' claims, and Plaintiffs Little and Ramos have diagnosed mental health disabilities.

259.    Plaintiffs have no conflict of interest with any members of the proposed Class, are committed to the vigorous prosecution of all claims on behalf of the proposed Class, and will fairly and adequately protect the interests of the proposed class.

260.    Plaintiffs are represented by attorneys from Abolitionist Law Center and Kaufman Lieb Lebowitz & Frick LLP who have an extensive background in prisoners' rights and civil rights litigation, including class actions.

261.    On information and belief, Defendants maintain records identifying which individuals were housed in each cell in the RHU during the relevant time period, thereby making the composition of the class readily ascertainable.

262.    Questions of law and fact common to class members predominate, and a class action is superior to other methods for adjudicating the controversy because, among other reasons:

    a.  Given class members' limited resources, class members' limited access to counsel, and the legal complexity of the claims, class members are unlikely to prosecute separate actions in large numbers;

    b.  Litigation concerning the punitive deprivations at DCP should be concentrated in a single forum; and

    c.  Because Defendants and/or the Pennsylvania Department of Corrections retain the contact information of all class members, the difficulties in administering a class action are minimal, as Defendants or other government entities are

readily equipped to locate class members and provide them with any required notice.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – Fourteenth Amendment, Due Process, Deprivation of Basic Human Needs
On Behalf of Plaintiffs and the Fourteenth Amendment Subclass Against Defendants Briggs and Pierre

263.    Plaintiffs repeat and re-allege the above paragraphs as if fully set forth here.

264.    In subjecting Plaintiffs and other members of the Fourteenth Amendment Subclass to deprivations of electricity, electronic devices, personal belongings, and out-of-cell time for extended periods of time, Defendants punitively inflicted significant physical and emotional suffering and injury.

265.    Plaintiffs and Fourteenth Amendment Subclass members were deprived of the basic human needs of physical and mental health, safety, warmth, light, sleep, exercise, and hygiene.

266.    Objectively, Defendants' actions were unreasonable in relation to any legitimate governmental purpose.

267.    Subjectively, Defendants acted with deliberate indifference and acted punitively and maliciously for the purpose of causing harm and punishing individuals housed in RHU.

268.    Defendants deprived Plaintiffs and other members of the Fourteenth Amendment Subclass of their rights as pretrial detainees guaranteed by the Fourteenth Amendment of the United States Constitution.

269.    At all relevant times, Defendants were acting under color of state law.

270.    As a result of these acts, Plaintiffs and other members of the Fourteenth Amendment Subclass suffered the alleged damages.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Eighth Amendment, Deliberate Indifference
On Behalf of Plaintiff James Patterson and the Eighth Amendment Subclass Against Defendants
Briggs and Pierre

271.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth here.

272.    To the extent that the Fourteenth Amendment does not apply to convicted individuals awaiting sentencing, such as Plaintiff Patterson, those individuals assert constitutional violations under this cause of action on behalf of themselves and the Eighth Amendment Subclass.

273.    Objectively, the alleged deprivations imposed by Defendants Briggs and Pierre were sufficiently serious as to deprive Plaintiff Patterson and the other members of the Eighth Amendment Subclass of the basic human needs of physical and mental health, safety, warmth, light, sleep, exercise, and hygiene.

274.    Subjectively, by imposing the alleged deprivations, Defendants Briggs and Pierre were deliberately indifferent to the health and safety of Plaintiff Patterson and the Eighth Amendment Subclass.

275.    Defendants deprived Plaintiff Patterson and the Eighth Amendment Subclass of their rights under the Eighth Amendment of the United States Constitution.

276.    At all relevant times, Defendants were acting under color of state law.

277.    As a result of these acts, Plaintiff Patterson and other members of the Eighth Amendment Subclass suffered the alleged damages.

## THIRD CAUSE OF ACTION
42 U.S.C. § 12131 *et seq.* – Title II of the Americans with Disabilities Act
On Behalf of Plaintiffs Kani Little and Hector Ramos and the Mental Health Subclass
Against Defendant Dauphin County

278.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth here.

279.    Under the Americans with Disabilities Act (ADA), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

280.    A public entity may not, on the basis of an individual's disability, deny him "the opportunity to participate in or benefit from the aid, benefit, or service" offered to other incarcerated individuals. 28 C.F.R. § 35.130(b)(1).

281.    Furthermore, a public entity may not act in a way that "has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3).

282.    Finally, public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. . .." 28 C.F.R. § 35.130(b)(7)(i).

283.    At all relevant times, Plaintiff Kani Little's anxiety and/or depression constituted a disability within the meaning of the ADA. 42 U.S.C. § 12131(1)(A).

284.    At all relevant times, Plaintiff Hector Ramos's schizophrenia and/or depression constituted a disability within the meaning of the ADA. 42 U.S.C. § 12131(1)(A).

285.    Defendant Dauphin County is a "public entity" under the ADA.

286.    Defendant's actions of imposing a blackout, depriving Plaintiffs and Mental Health Subclass members of medication or administering them inconsistently and confining them to their cell for days at a time had the effect of exacerbating Plaintiffs' and Mental Health Subclass members' disabilities and denying them services offered to other individuals incarcerated at DCP.

287.    Despite the well-known effects of long-term isolated confinement on people with mental health disabilities, Defendant failed to provide Plaintiffs and other members of the Mental Health Subclass with reasonable accommodations to avoid discriminating against them on the basis of their disabilities.

288.    Defendant's actions in depriving Plaintiffs and members of the Mental Health Subclass of properly administered medication, access to electricity, and out-of-cell time were willful, malicious, and conscience-shocking.

289.    As a direct and proximate result of Defendant's violations of Title II of the ADA, Plaintiffs Kani Little and Hector Ramos and the Mental Health Subclass suffered the alleged damages.

### FOURTH CAUSE OF ACTION
29 U.S.C. § 794 – Rehabilitation Act
On Behalf of Plaintiffs Kani Little and Hector Ramos and the Mental Health Subclass
Against Defendant Dauphin County

290.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth here.

291.    On information and belief, DCP receives federal funding.

292.    The protections of the Rehabilitation Act and the rules and regulations promulgated thereunder are substantively identical to those outlined in Title II of the ADA.

293.    As a result, Defendant Dauphin County violated the Rehabilitation Act for the same reasons set forth above in the Third Cause of Action.

294.    As a direct and proximate result of Defendant's violations of the Rehabilitation Act, Plaintiffs Little and Ramos and the Mental Health Subclass suffered the alleged damages.

### FIFTH CAUSE OF ACTION
42 U.S.C. § 1983 – First Amendment, Free Exercise of Religion
On Behalf of All Plaintiffs and the Class Against Defendants Briggs and Pierre

295.    Plaintiffs repeat and re-allege the above paragraphs as if fully set forth here.

296.    Plaintiffs and other members of the Class have a fundamental First Amendment right to freely exercise their religion, including the ability to congregate, read religious materials, and adhere to religious practices.

297.    Plaintiffs and other members of the Class were deprived of their ability to freely exercise their religion as a result of Defendants' imposition of a blackout, deprivation of electronic devices from which individuals could access religious materials, and prolonged confinement without recreational time.

298.    The deprivations imposed on Plaintiffs and other members of the Class were not rationally related to any compelling government interest.

299.    Because Plaintiffs and other members of the Class could only access religious materials through their tablets, which were confiscated as part of DCP's deprivation campaign, Plaintiffs and other members of the Class had no alternative means of expressing their First Amendment right.

300.    Accordingly, these restrictions deprived Plaintiffs and other members of the Class of rights guaranteed by the First Amendment of the United States Constitution.

301.    In taking the actions hereinbefore alleged, Defendants acted under color of state law.

302.    As a result of Defendants' actions, Plaintiffs and other members of the Class suffered the alleged damages.

### SIXTH CAUSE OF ACTION
42 U.S.C. § 2000cc – Religious Land Use and Institutionalized Persons Act
On Behalf of All Plaintiffs and the Class Against Defendant Dauphin County

303.    Plaintiffs repeat and re-allege the preceding paragraphs as if set forth here.

304.    RLUIPA provides: "No government shall impose a substantial burden of the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc(a)(1)-(2).

305.    Plaintiffs and other members of the Class are "person[s]" as defined under the RLUIPA. See 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997(3).

306.    Plaintiffs' and class members' desire to access religious materials and congregate for religious purposes constitute a sincerely held religious belief.

307.    At all relevant times, Defendant Dauphin County met the definition of government under RLUIPA. See 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).

308.    At all relevant times, DCP was a federally funded "institution" as defined under RLUIPA and the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. § 1997(1)(B)(ii)-(iii).

309.    Plaintiffs and members of the Class were "residing in or confined to an institution" during the relevant time period as that term is defined under RLUIPA.

310.    Defendant Dauphin County's acts, omissions, policies, and/or customs substantially burdened Plaintiffs' and class members' religious exercise by denying them the ability to access religious materials or congregate for religious purposes.

311.    Defendant Dauphin County's acts, omissions, policies, and/or customs did not further a substantial government interest.

312.    Defendant Dauphin County's acts, omissions, policies, and/or customs are not the least restrictive means of furthering a compelling government interest.

313.    As a direct and proximate result of Defendants' wrongful acts, omissions, policies, and/or customs, Plaintiffs and other members of the Class sustained damages.

## SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 –Fourteenth, Eighth, and First Amendments – Municipal Liability
On Behalf of All Plaintiffs and the Class Against Defendant Dauphin County

314.    Plaintiffs repeat and re-allege the above paragraphs as if fully set forth here.

315.    The Dauphin County Jail Oversight Board and its municipal policymakers were aware of and deliberately indifferent to Defendant Warden Briggs' imposition of a blackout and punitive deprivations on RHU residents during the relevant time period, demonstrating its acquiescence in and tacit ratification of those actions.

316.    By failing to adequately discipline and supervise the warden and other prison administrators who engaged in such misconduct or instruct prison administrators to immediately cease the constitutional violations, Dauphin County was deliberately indifferent to the constitutional rights of its citizens, including Plaintiffs and other members of the class.

317.    By any and/or all of these means, Defendant Dauphin County caused the violations of Plaintiffs' and class members' Fourteenth, Eighth, and First Amendment rights set forth in the First, Second, and Fifth Causes of Action above.

318.    As a result, Plaintiffs and other members of the Class suffered the alleged damages.

## EIGHTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force
On Behalf of Plaintiff Kani Little Against Defendants Pierre, Lucas, Skelton, and John Does #1-12

319.    Plaintiffs repeat and re-allege the above paragraphs as if fully set forth here.

320.    On or about December 8, 2023, and in response to Plaintiff Little's complaints about the RHU's blackout conditions, Defendants John Does #1-12 used objectively unreasonable force against Plaintiff Little.

321.    On or about December 8, 2023, and in response to Plaintiff Little's complaints about the RHU's blackout conditions, Defendants Pierre, Lucas, and Skelton personally directed and/or authorized the use of objectively unreasonable force against Plaintiff Little.

322.    In addition or in the alternative, Defendants John Does #1-12, Pierre, Lucas, and Skelton failed to intervene to prevent the use of objectively unreasonable force against Plaintiff Little despite having knowledge of its use and a reasonable opportunity to intercede to prevent it.

323.    As a result, Plaintiff Little suffered the alleged damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.    An order certifying the above-mentioned Class, Fourteenth Amendment Subclass, Eighth Amendment Subclass, and Mental Health Subclass under Federal Civil Rule of Civil Procedure 23(b)(3);

2.    Declaratory judgment that Defendants violated Plaintiffs' and class members' constitutional and statutory rights as set forth above;

3.    Compensatory damages (or, if not, nominal damages) in an amount to be determined at trial on behalf of Plaintiffs and class members;

4.    Punitive damages on behalf of Plaintiffs and class members against all Defendants except Dauphin County in an amount to be determined at trial;

5.    Reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and other applicable law;

6.    Pre- and post-judgment interest to the fullest extent permitted by law; and

7.    Any additional relief the Court deems just and proper.

_____
ABOLITIONIST LAW CENTER

/s/ *Bret Grote*
/s/ *Margaret Hu* (*pro hac vice* forthcoming)
Abolitionist Law Center
990 Spring Garden, Suite 306
Philadelphia, Pennsylvania 19123
(412)654-9070
bretgrote@alcenter.org
margo@alcenter.org

_____
KAUFMAN LIEB LEBOWITZ & FRICK LLP

Douglas E. Lieb (*pro hac vice* forthcoming)
Poojitha Shivaprasad (*pro hac vice* forthcoming)
18 East 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
dlieb@kllf-law.com
pshivaprasad@kllf-law.com

Dated: December 17, 2024