# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KANI LITTLE; HECTOR RAMOS; JAMES PATTERSON, on their own behalf and on behalf of all others similarly situated; | : : : : | |
| | : | Civil Action No. 4:24-cv-02169 |
| Plaintiffs, | : : | |
| v. | : : | **JURY TRIAL DEMANDED** |
| DAUPHIN COUNTY; GREGORY BRIGGS, Warden of Dauphin County Prison, in his Individual Capacity; LIONEL PIERRE; Chief Deputy Warden, in his Individual Capacity; ROGER LUCAS, Custody Major, in his individual Capacity; MARK SKELTON, Lieutenant, in his Individual Capacity; and JOHN DOES No. 1-12, in their Individual Capacities, | : : : : : : : : : | |
| Defendants. | | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Date: April 15, 2025

# TABLE OF CONTENTS

I.   Introduction..................................................................................................1

II.  Statement of Relevant Facts ..................................................................1

III. Legal Standard ..........................................................................................5

IV.  Legal Argument ........................................................................................5

    a.   The motion to dismiss stage is not the right time to consider class certification, and Defendants' arguments provide no basis for dismissal ............5

    b.   Plaintiffs have sufficiently alleged Eighth Amendment deliberate indifference and Fourteenth Amendment due process claims............................11

       1.   Plaintiffs plausibly allege objectively serious deprivations......................12

       2.   Plaintiffs plausibly allege Defendants' deliberate indifference and personal involvement ...............................................................................................15

       3.   Plaintiffs plausibly allege Fourteenth Amendment objective unreasonableness ...............................................................................................19

    c.   Plaintiffs have sufficiently alleged First Amendment free exercise of religion and Religious Land Use and Institutionalized Persons Act claims ....................22

    d.   Plaintiffs have sufficiently alleged Americans with Disabilities Act and Rehabilitation Act claims...................................................................................26

    e.   Plaintiffs have sufficiently alleged municipal liability claims .....................29

    f.   Plaintiffs have sufficiently alleged excessive force claims under the Fourteenth Amendment .......................................................................................31

V.   Conclusion ..............................................................................................32

## Cases

*A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572 (3d Cir. 2004)................................................................................. 18, 32

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...............................7

*Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990) ...........................29

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................ 5, 17, 21

*Aspinall v. Thomas*, 118 F. Supp. 3d 664 (M.D. Pa. 2015)......................17

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) ...........................29

*Brennan v. Norton*, 350 F.3d 399 (3d Cir. 2003)......................................30

*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015).....................................9

*City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983)...................11, 19

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ...............................30

*Colburn v. Upper Darby Twp.*, 838 F.2d 663 (3d Cir. 1988) ...................16

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ...................5

*DeHart v. Horn*, 227 F.3d 47 (3d Cir. 2000) ...........................................21

*Farmer v. Brennan*, 511 U.S. 825 (1994)..........................................11, 15

*Fletcher v. O'Donnell*, 867 F.2d 791 (3d Cir. 1989) ...............................29

*Foglia v. Renal Ventures Mgmt.,* 754 F.3d 153 (3d Cir. 2014) .................5

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) .........................5

*Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285 (3d Cir. 2019) ...................27

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) .........................7

*Gonzalez v. Owens Corning*, 885 F.3d 186 (3d Cir. 2018) .......................7

*Graham v. Connor*, 490 U.S. 386 (1989) ...............................................31

*Holt v. Hobbs*.............................................................................................25

*Hoptowit v. Spellman*, 753 F.2d 779 (9th Cir. 1985).............................14

*Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005)...............................10, 20

*In re Subuxone Antitrust Litig.*, 421 F. Supp. 3d 12 (E.D. Pa. 2021).......................8

*Jacobs v. Cumberland Cnty.*, 8 F.4th 187 (3d Cir. 2021)........................11

*Jones-El v. Berge*, No. 00-C-421-C, 2001 WL 34379611 (W.D. Wisc. Aug. 14, 2001) ......................................................................................................10

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)........................................11

*Kokinda v. Pa. Dep't of Corr.*, 663 F. App'x 156 (3d Cir. 2016) ...........26

*Lewis v. Lane*, 816 F.2d 1165 (7th Cir. 1987) ........................................14

*Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368 (3d Cir. 2019) .......14

*Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34 (1st Cir. 2013) .............................7

*Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163 (3d Cir. 2015) ........................26

*McPherson v. Cnty. of Dauphin*, No. 1:19-CV-01865, 2020 WL 1558206 (M.D. Pa. Mar. 24, 2020) .....................................................................................................27

*Mutschler v. SCI Albion CHCA Health Care*, 445 F. App'x 617 (3d Cir. 2011)....26

*Oravksy v. Encompass Ins. Co.*, 804 F. Supp. 2d 228 (D.N.J. 2011)........................7

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ...............................................26

*Ramirez v. Pugh*, 486 F. Supp. 2d 421 (M.D. Pa. 2007) .........................................21

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980) ...................................................15

*Rapier v. Harris*, 172 F.3d 999 (7th Cir. 1999).....................................................20

*Rhodes v. Chapman*, 452 U.S. 337 (1981) ..............................................................12

*Richardson v. Bledsoe*, 829 F.3d 273 (3d Cir. 2016) ...............................................6

*Robinson v. Superintendent Houtzdale SCI*, 693 F. App'x 111 (3d Cir. 2017)........23

*Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494 (E.D. Pa. 1988) ....................10

*Sampson v. Berks Cty. Prison*, 171 F. App'x 382 (3d Cir. 2006)............................14

*Seville v. Martinez*, 130 F. App'x 549 (3d Cir. 2005) ..............................................9

*Smith v. Interline Brands, Inc.*, 87 F. Supp. 3d 701 (D.N.J. 2014) .........................6

*Steele v. Cicchi*, 855 F.3d 494 (3d Cir. 2017)..........................................................9

*Stevenson v. Carroll*, 495 F.3d 62 (3d Cir. 2007)...................................................20

*Sutton v. Rasheed*, 323 F.3d 236 (3d Cir. 2003), *as amended* (May 29, 2003)  22, 24

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) .............................27

*Teets v. Wetzel*, 630 F. Supp. 3d 679 (W.D. Pa. 2022) ...........................................18

*Turner v. Safley,* 482 U.S. 78 (1987).......................................................................22

*Union County Jail Inmates v. DiBuono*, 713 F.2d 984 (3d Cir. 1983)....................20

*United States v. Georgia*, 546 U.S. 151 (2006) ......................................................27

*Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007) ..................................................22

*Williams v. City of Phila.*, 270 F.R.D. 208 (E.D. Pa. 2010) ...................................10

*Wilson v. Seiter*, 501 U.S. 294 (1991) .....................................................................12

*Young v. Quinlan,* 960 F.2d 351 (3d Cir. 1992) ......................................................14

## Statutes

29 U.S.C. § 794 .........................................................................................................26

42 U.S.C. § 12131 .....................................................................................................26

42 U.S.C. § 12132 .....................................................................................................26

**Other Authorities**

3d Cir. Model Civ. Jury Instr. § 4.6.5 (2024) .................................................... 29, 30

**Rules**

Fed. R. Civ. P. 23 .......................................................................................7, 8

Fed. R. Civ. P. 8 ..........................................................................................5

**Constitutional Provisions**

U.S. CONST. amend. 14 ...........................................................................11

## I.     Introduction

This case raises serious claims of wanton and cruel conditions of confinement at the Dauphin County Prison. The Complaint consists of detailed allegations as to each element of the claims, the personal involvement of all Defendants, the standards for municipal liability, and the requirements for class action litigation found in Federal Rule of Civil Procedure 23. Defendants' motion to dismiss relies on mischaracterizations of Plaintiffs' Complaint, raises conclusory arguments that fail to acknowledge well-pled allegations, and improperly asks the Court to resolve disputed factual issues before discovery has even commenced. For the following reasons, the motion to dismiss should be denied.

## II.     Statement of Relevant Facts

Between November and December 2023, Dauphin County Prison (DCP) officials, under the direction of Warden Briggs and Deputy Warden Pierre, responded to alleged smoking of synthetic marijuana in the Restricted Housing Unit (RHU) by initiating a punitive campaign. Plaintiffs Kani Little, Hector Ramos, and James Patterson were imprisoned in the RHU during the relevant time period. First, all those in the RHU had their tablets confiscated. These tablets provided access to religious texts, legal materials, the law library, educational and mental health programs, mail (including legal correspondence), and phone communication.

1

Because DCP prohibits physical reading materials and offers no in-person religious services, the tablet seizure cut people off from any religious services or written religious materials. Some individuals were without their tablets for six weeks to three months, even after returning to the general population. Compl. ¶¶ 66-76.

On or around November 21, 2023, staff conducted a coordinated search of all cells in the RHU, again under the direction of Briggs and Pierre. *Id.* ¶¶ 77-78. Staff seized all personal belongings, including essential hygiene products, legal documents, writing materials, extra clothing, bedding, and footwear, leaving people in the RHU with only a basic short-sleeve uniform, boxers, and shower slides. Access to hygiene supplies remained severely limited for the following month. Toilet paper was distributed in inadequate quantities, further worsening sanitary conditions. *Id.* ¶¶ 77-88. Following this, individuals in the RHU were locked in their cells without access to showers or recreational time for approximately 10 days. Even after showers were reintroduced, Plaintiffs were only allowed to shower for 15 minutes every three days in mold-infested showers. For nearly a month, Plaintiffs were given just two hours of time outside their cells total. *Id.* ¶¶ 89-98.

On or around December 2, 2023, the prison cut off all electrical power, again under orders from Warden Briggs and supported by Deputy Warden Pierre. *Id.* ¶¶ 99-102. This blackout lasted until December 19. During this time, there was no heat despite outside temperatures falling to 24°F. With no bedding or warm clothing due

to earlier seizures, Plaintiffs resorted to cutting open mattresses and using insulation for warmth. Ventilation systems continued to blow in cold air from outside, intensifying the cold. *Id*. ¶¶ 99-111. The absence of electricity left the basement-level cells in near-total darkness for over 14 hours a day. Limited natural light even made it difficult to see during the day. *Id.* ¶¶ 112-114. These conditions significantly impacted the mental and physical health of Plaintiffs, causing disorientation, sleep disturbances, constant shivering, and numbness. The darkness also prevented Plaintiffs from inspecting their food, which often contained unsanitary items like bugs and hair. *Id*. ¶¶ 115-119. Water access was also sporadically shut off for days at a time. Plaintiffs could not flush toilets or wash, resulting in unsanitary conditions with human waste lingering in cells, and drinking water was inconsistently provided. *Id*. ¶¶ 120-124. Medication delivery, which typically occurred twice daily, became irregular during the blackout and Plaintiffs could not verify their medications or dosages due to the lack of light. *Id*. ¶¶ 125-130.

The cumulative effect of these deprivations—loss of communication, hygiene, heating, light, food safety, medication, and mobility—had profound impacts on the physical and mental well-being of those held in the RHU. Many experienced severe psychological distress, including depression, stress, anger, suicidal ideation, and a deepened sense of helplessness and isolation. *Id*. ¶ 131. For Plaintiffs with mental health conditions, their disabilities were particularly

exacerbated by the deprivation of necessary medications, out-of-cell time, and access to electricity and programming. *Id*. ¶¶ 283-288.

On December 8, 2023, while returning from a medical visit, Mr. Little—handcuffed and restrained—asked to speak to jail officials about the inhumane conditions on the RHU, instead of immediately returning to his cell. He was soon confronted by a team of DCP officials, including Lieutenant Mark Skelton, Custody Major Roger Lucas, and Deputy Warden Lionel Pierre, to whom he voiced concerns on behalf of himself and others. After his requests for relief were denied, approximately twelve riot-gear-clad guards stormed the unit and violently assaulted Mr. Little, slamming him to the ground and causing him to lose consciousness. He awoke, still restrained, being carried from the unit with mace sprayed on his face. The assault took place in full view of senior staff, who did nothing to intervene. Once relocated to Block P-3, the abuse continued: guards forced Mr. Little to strip, then punched, tased, kneed, and rubbed mace into his face while others restrained him. Despite visible injuries, including head trauma, facial bleeding, and rib bruising, Mr. Little received insufficient medical attention. He was placed in segregation and denied further treatment, and he continues to suffer from possible nerve damage, including twitching in his neck and hands. *Id*. ¶¶ 153-177.

On December 17, 2024, Plaintiffs filed this action, including allegations as to each required element for maintaining class action claims under Fed. R. Civ. P. 23. *Id*. ¶¶ 254-262.

## III.    Legal Standard

When considering a motion to dismiss, the Court's sole inquiry is whether the complaint alleges sufficient facts to state a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). In doing so, it accepts all material facts as true, along with any reasonable inferences. *Foglia v. Renal Ventures Mgmt.,* 754 F.3d 153, 154 n.1 (3d Cir. 2014). The complaint's purpose is to provide fair notice of the plaintiff's claims, not to prove the case, and it need only raise a reasonable expectation that discovery will uncover supporting evidence. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016); *see also* Fed. R. Civ. P. 8(a).

## IV.    Legal Argument

### a.    The motion to dismiss stage is not the right time to consider class certification, and Defendants' arguments provide no basis for dismissal

Defendants' argument against class certification fails for two reasons. *See* Defs.' Br. (ECF No. 21) at 7-12. First, it is premature, as it was entirely proper for Plaintiffs to allege grounds for class certification in the Complaint while waiting to

move for class certification at an early practicable opportunity with the benefit of some discovery. As Defendants themselves acknowledge, the issue of class certification is not ripe for adjudication at this juncture. *See id*. at 6-7. But second, to the extent the Court considers the merits of the issue, Plaintiffs have sufficiently alleged the requirements for class certification.

Defendants' arguments are premature, as Plaintiffs are allowed a reasonable timeframe to move for class certification. The Third Circuit (along with other courts of appeals) has held that Rule 23(c)(1)(A)'s only requirement is that the question of certification be resolved at "an early practicable time." *Richardson v. Bledsoe*, 829 F.3d 273, 288 (3d Cir. 2016). (quoting Rule 23(c)(1)(A)). If anything, courts have actively discouraged premature motions or rulings on class certification in favor of those brought within said reasonable timeframe. *Id* at 284 ("Our ruling today is intended to have the salutary effect of discouraging these premature motions… because a plaintiff, by waiting until it would be appropriate to seek class certification, does not run the risk of having the entire class action mooted in the interim"); *see also Smith v. Interline Brands, Inc*., 87 F. Supp. 3d 701, 701-03 (D.N.J. 2014) (denying a premature motion for class certification and explaining that *Weiss* "is a sensible recognition of the undesirability of a premature motion for class certification, unsupported by discovery and largely untethered to the requirements for actually certifying a class.").

6

This rule exists because a court should typically await discovery and "the development of a factual record before determining whether the case should move forward on a representative basis." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013). Indeed, "dismissal of class allegations at [the motion to dismiss] stage should be done rarely and the better course is to deny such motion because the shape and form of a class action evolves only through the process of discovery." *Oravksy v. Encompass Ins. Co.*, 804 F. Supp. 2d 228, 241 (D.N.J. 2011) (cleaned up). For these reasons, at this stage, Plaintiffs are not required to address and the Court need not consider the merits of class certification. Rather, the Court should consider the issue upon a motion at the appropriate time with the benefit of relevant factual development.

To the extent the Court considers the issue, however, Plaintiffs have sufficiently addressed the requirements for class certification required at this juncture. A putative class must meet the elements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a); *Gonzalez v. Owens Corning*, 885 F.3d 186, 192 (3d Cir. 2018) (*citing Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)). Certification is proper once the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gonzalez*, 885 F.3d at 192 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Additionally,

the proposed class must also fit within one of the categories of class actions defined in Rule 23(b). Fed. R. Civ. P. 23(b).

In their Complaint, Plaintiffs address how the proposed class satisfies the requirements of Rules 23(a) and 23(b)(3). Compl. ¶¶ 254-62. Specifically, Plaintiffs have clearly defined the bounds of their proposed class as all persons detained at Dauphin County Prison in units P-3, P-5, and/or P-6 of the Restricted Housing Unit from November 16 to December 19, 2023. While Plaintiffs lack knowledge at this juncture without discovery of exactly how many RHU beds were full at the time of the incident, the 62-person capacity of the RHU gives rise to a plausible inference that the class is so numerous as to make joinder impracticable. *See, e.g.*, *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 46 (E.D. Pa. 2021) (numerosity generally satisfied if class has 40 or more members). Plaintiffs have listed multiple questions of law and fact common to the class; justified the Plaintiffs' claims as typical of the nature and seriousness of the deprivations suffered by the class; and stated how Plaintiffs adequately protect the class's interests through their alignment and commitment to prosecuting the class claims. As a result, the elements facially required for class certification are adequately alleged in Plaintiffs' complaint.

Defendants' contrary arguments have no merit. Defendants' claim that the class is not ascertainable borders on frivolous. *Cf.* Defs.' Br. 9-10. The ascertainability inquiry focuses solely on whether class members *can* be identified,

not on whether they *have* been identified to date. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). A class is ascertainable if it (1) "is defined with reference to objective criteria" and (2) "a reliable and administratively feasible mechanism exists for determining whether putative class members fall within the class definition." *Id.* (cleaned up).

Those simple requirements are readily satisfied here. The class is defined entirely by "objective criteria": who was housed in which units within Defendants' custody on what dates. It is more than plausible to infer at this juncture that DCP keeps records of which incarcerated persons it assigns to which housing units. Given that P-3, P-5, and P-6 are segregation units, and that the imposition of segregation involves constitutionally mandated due process, one would certainly hope that Defendants have records of how and why incarcerated people ended up in these units. *See, e.g.*, *Steele v. Cicchi*, 855 F.3d 494, 507-09 (3d Cir. 2017); *Seville v. Martinez*, 130 F. App'x 549, 551 (3d Cir. 2005). To the extent Defendants somehow lack this basic paperwork essential to the orderly functioning of a jail, however, video footage from within the prison showing individuals being placed in their housing units would also make it feasible to identify putative class members.

Defendants' claims that not all class members suffered the same *injuries*, Defs.' Br. 8, and that insufficient common questions of law exist, *id.* at 10-11, fare no better. As an initial matter, the possibility that class members suffered different

injuries cannot and does not defeat class certification where common issues regarding liability predominate. *See, e.g.*, *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494, 499 (E.D. Pa. 1988). But Defendants also ignore the many *common* injuries and harms pleaded throughout the Complaint, including, but not limited to: lack of showers or access to the same unsanitary showers, Compl. ¶ 93, lack of recreation time, *id.* ¶ 96, freezing temperatures, *id.* ¶¶ 106-11, a disorienting absence of light, *id.* ¶¶ 112-14, and lack of access to sanitary water, *id.* ¶¶ 120-24. With respect to common questions, the district court certified a class on Eighth Amendment conditions-of-confinement claims in the very case on which Defendants rely. *See Jones-El v. Berge*, No. 00-C-421-C, 2001 WL 34379611, at *1, *11-13 (W.D. Wisc. Aug. 14, 2001); *cf.* Defs.' Br. 10. Class certification is exceedingly common where, as here and as in *Jones-El*, plaintiffs challenge conditions of confinement that applied broadly to entire categories of prisoners in particular housing units or facilities. *See, e.g.*, *Hubbard v. Taylor*, 399 F.3d 150, 168 (3d Cir. 2005) (vacating denial of class certification in action challenging practice of triple-celling at Wilmington, Delaware, jail); *Williams v. City of Phila.*, 270 F.R.D. 208 (E.D. Pa. 2010) (certifying class challenging overcrowding in the Philadelphia prison system).

### b. Plaintiffs have sufficiently alleged Eighth Amendment deliberate indifference and Fourteenth Amendment due process claims

Plaintiffs' claims satisfy the elements required by both the Eighth and Fourteenth Amendments.

The Eighth Amendment prohibition against cruel and unusual punishment protects against the deprivation of basic human needs. U.S. CONST. amend. 8. In the context of conditions-of-confinement claims, the Eighth Amendment applies to sentenced persons, and a Plaintiff asserting an Eighth Amendment claim must plausibly allege two requirements: first, that they were held under objectively inhumane conditions posing a substantial risk of serious harm; and second, that prison officials displayed "deliberate indifference" to their health or safety. *Farmer v. Brennan*, 511 U.S. 825 (1994).

The substantive due process protections of the Fourteenth Amendment safeguard the rights of pretrial detainees in a similar manner. U.S. CONST. amend. 14. The protections of the Fourteenth Amendment for pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). With respect to Fourteenth Amendment claims, Defendants' actions are evaluated under a standard of objective reasonableness. *See generally Kingsley v. Hendrickson*, 576 U.S. 389 (2015). "[P]retrial detainees (unlike convicted prisoners) cannot be punished at all,

much less maliciously and sadistically." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 194 (3d Cir. 2021) (cleaned up).

### 1. Plaintiffs plausibly allege objectively serious deprivations

For the objective test, the Eighth Amendment asks if the deprivations suffered amount to a denial of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison officials are required to provide humane conditions of confinement, ensuring that incarcerated people are not deprived of basic human needs. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

Here, Plaintiffs thoroughly lay out a multitude of basic needs that Defendants not only failed to protect, but in fact deliberately took away. These include being held in a prolonged state of darkness, extreme cold, and inescapable filth that amounted to a state of "near-total deprivation." Compl. ¶ 11. In the complaint, Plaintiffs first plausibly allege that solitary confinement, by its nature of isolating individuals for prolonged periods, already causes well documented harm, including dire mental health issues, decreased cognitive functioning, and physiological distress. *Id.* at ¶¶ 48-58. Plaintiffs then lay out the many additional progressing and overlapping deprivations that Defendants subjected to the RHU population.

For instance, Plaintiffs were deprived of any semblance of basic or proper hygiene for approximately an entire month. Following DCP's confiscation of all personal belongings, Plaintiffs were left with either zero or extremely deficient

hygiene products, lacking sufficient toilet paper, toothbrushes, and soap. *Id*. ¶¶ 79-86. On top of this, Plaintiffs were denied regular access to showers, with an initial ten-day deprivation followed by a 15-minute shower every three days. *Id.* ¶¶ 89-95. This lack of basic hygiene products, showers, and any spare clothing resulted in a state of desperately poor hygiene across the RHU, to the degree that some reported their clothes changing color. *Id.* ¶ 145. Additionally, Plaintiffs were denied any out of cell time beyond this small shower window. *Id.* ¶¶ 96-98. These deprivations intensified the isolation and restriction of movement to which Plaintiffs were already subject in the RHU, resulting in only a cumulative two hours spent out of their cells over the course of a month. *Id*.

Compounding the severity of these conditions was the intentional shut-off of electrical power, which plunged the entire unit into freezing cold and dark. *Id*. ¶¶ 99-114. The freezing temperatures were entirely unmitigated, since Plaintiffs had little to no insulation after the seizure of all personal belongings, which included all long-sleeved layers, shoes, sheets, and pillows. *Id.* ¶ 109. With only a single blanket, slides, and a thin short-sleeve issue uniform, Plaintiffs were subject to such intense cold that multiple individuals cut open their mattresses and swaddled themselves inside for warmth. *Id.* ¶ 111. On top of this, because the RHU at DCP is a basement unit, Plaintiffs lived in complete darkness for 14 hours a day and were left with limited visibility otherwise. *Id.* ¶ 114. Due to the preexisting state of the DCP's RHU,

this meant that Plaintiffs were unable to properly inspect their food, which regularly contained bugs, hair, or other debris, or their medication, which came at inconsistent rounds, if at all. *Id.* ¶¶ 118-19, 125-30. During this intentional power blackout, Plaintiffs were additionally subject to periodic water shutoffs, depriving them of drinking water, leaving them unable to wash their hands, and forcing them to spend days next to toilets with festering human feces. *Id.* ¶¶ 120-124.

Extensive precedent establishes that conditions similar to those suffered by Plaintiffs state viable Eighth Amendment claims. *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368 (3d Cir. 2019) (holding that being denied clothing, bedding, and subjected to low cell temperatures while a cell was constantly lit for four days was sufficient to plead Eighth Amendment conditions of confinement claims); *Sampson v. Berks Cty. Prison*, 171 F. App'x 382, 385 (3d Cir. 2006) ("[W]hether the cell temperature, the length of the inmate's confinement in such temperatures, and the failure of prison officials to ameliorate the cold temperatures creates a sufficiently serious deprivation of the human need of adequate shelter to state a claim under the Eighth Amendment is often an issue to be determined by the trier of fact."); *Young v. Quinlan,* 960 F.2d 351, 366 (3d Cir. 1992) ("It would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days in a stench that not even a fellow prisoner could stand."); *Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir. 1985) (affirming district court holding that lighting which was

inadequate for reading and caused eyestrain and impeded sanitation was unconstitutional) *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987) ("An allegation of inadequate heating may state an eighth amendment violation."); *see also Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980).

### 2. Plaintiffs plausibly allege Defendants' deliberate indifference and personal involvement

The subjective prong of an Eighth Amendment claim requires that Defendants acted with "deliberate indifference" towards incarcerated persons' health or safety. This is defined as whether a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Deliberate indifference entails something "more than negligence" but less than purposeful harm. *Id*. at 835. A prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Plaintiffs have sufficiently pleaded deliberate indifference by alleging that Defendants were directly responsible for creating and maintaining the unconstitutional conditions alleged. Plaintiffs' Complaint outlines the responsibilities of each Defendant in their capacity as prison administrators overseeing use of solitary confinement, operational decisions, and staff directives.

15

Compl. ¶¶ 22-27. Plaintiffs allege that the conditions at issue—complete seizure of belongings, power blackout, and facility-wide shutdown—were imposed pursuant to direct orders from Defendants Warden Briggs and Deputy Warden Pierre. *See id.* ¶ 68 ("Defendants Warden Briggs and Deputy Warden Pierre directed DCP staff to seize the tablets and were fully aware of the operation."); *id.* ¶ 78 ("Defendants . . . directed staff to conduct the search and seizure and were fully aware of the plan before it occurred."); *id.* ¶ 91("Defendants . . . approved this change in policy on recreational time and shower access."); *id.* ¶ 100 ("Correctional officers told people held on P-6 that the order to cut power had come directly from Warden Briggs.").

Defendants' active personal role in implementing these harmful conditions— despite knowing the impact on detainees—establishes both prongs of the deliberate indifference test: they were aware of the risk and failed to take reasonable measures to avoid or mitigate the harm. As the Third Circuit has made clear, a supervisor's involvement may be shown through "personal direction, actual participation in the alleged misconduct, or contemporaneous knowledge of and acquiescence in the alleged misconduct*." Colburn v. Upper Darby Twp*., 838 F.2d 663, 673 (3d Cir. 1988). Plaintiffs' complaint meets this standard by setting forth particularized allegations of both direct personal involvement and contemporaneous awareness and acquiescence.

First, Plaintiffs specifically allege that these individual Defendants—Briggs and Pierre—gave direct orders to impose the mass deprivations at issue in this litigation. *See* Compl. ¶¶ 68, 78, 91, 100. Defendants' argument that these allegations cannot be credited because they are mere "stock language" or "boilerplate" misses the mark. *Cf.* Defs.' Br. 15-16. There is no way to for Plaintiffs allege that Defendants ordered the deprivations other than to do what they have done: allege plainly and straightforwardly that Defendants ordered the deprivations. The Complaint also alleges that the Warden's order to cut the power was reported contemporaneously by junior correctional officers to incarcerated people in Housing Unit P-6, Compl. ¶ 100, and that the power was cut by facilities staff at a circuit breaker to prevent lower-level officers from turning it back on if they wanted to, *id.* ¶ 101. These are factual allegations—not legal conclusions—that the Court must take as true on this motion. *See Iqbal*, 556 U.S. at 678.

Perhaps more importantly, Defendants ignore the factual context of this case, which makes these allegations more than plausible. This is not a situation in which a plaintiff was injured in a spontaneous one-off incident and then later alleges in a conclusory manner that supervisors directed that isolated act of misconduct. The misconduct at issue in this case is the protracted deprivation of light, heat, power, showers, and other privileges to multiple housing units within a municipal jail. It is not merely a plausible inference, but an obvious one, that the decision to impose

those deprivations was made by a facility supervisor. The allegations here are sufficient to plausibly allege personal involvement. *See, e.g.*, *Aspinall v. Thomas*, 118 F. Supp. 3d 664, 677 (M.D. Pa. 2015) (allegations that warden and deputy warden of the Wayne County Correctional Facility were personally aware of retaliatory conduct engaged in by correctional officer defendants was sufficient to state claim against them based on their personal involvement); *Teets v. Wetzel*, 630 F. Supp. 3d 679, 684-85 (W.D. Pa. 2022) (allegations that records supervisors personally reviewed plaintiff's records sufficient to allege personal involvement in plaintiff's unlawful overdetention).

Second, at a minimum, the Complaint supports a plausible inference that Defendants were personally involved in the deprivations by becoming aware of them while they were ongoing and acquiescing in them. *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (supervisors' failure to discipline subordinates for ongoing misconduct supported liability based on personal involvement for acquiescence). Again, it is not just a plausible inference, but an exceedingly obvious one, that DCP's Warden and Deputy Warden were aware that entire sectors of their jail were operating without light and heat for weeks at a time. Indeed, the Complaint specifically alleges that Plaintiff Little *directly complained* to Defendant Pierre about the blackout and asked for the power to be

restored, Compl. ¶¶ 160-61, and that all Plaintiffs grieved the issue through official channels, *id.* ¶¶ 179-82, 216-20, 250-53.

### 3. Plaintiffs plausibly allege Fourteenth Amendment objective unreasonableness

Given the higher threshold of protection afforded to pretrial detainees under the Fourteenth Amendment, Plaintiffs have by definition met their burden in pleading Fourteenth Amendment claims by sufficiently pleading Eighth Amendment claims. *See, e.g.*, *City of Revere*, 463 U.S. 239 at 244.

Defendants' argument that dismissal is required because they acted for the "legitimate penological purpose" of stopping synthetic marijuana use is unavailing for several reasons. Defs.' Br. 14, 18-20.

First, Defendants' claim that they acted for a legitimate purpose is contrary to the well-pleaded factual allegations of the Complaint, which the Court must accept as true on this motion. The Complaint alleges that, far from undertaking any kind of reasoned effort to eliminate the use of synthetic marijuana, Defendants collectively punished dozens of people out of anger. *See, e.g.*, Compl. ¶¶ 3, 4, 6. In other words, the Complaint plausibly alleges that the *actual* purpose of Defendants' actions was spite and punishment—which are, by definition, not legitimate penological purposes with respect to pretrial detainees, who "cannot be punished at all." *Jacobs*, 8 F.4th at 194. Defendants cannot simply declare that they have demonstrated a legitimate penological purpose by asserting facts contrary to those pleaded in the Complaint.

This argument simply confirms the need for discovery and fact-finding concerning Defendants' actual purpose in imposing the blackout.

Next, the mere assertion of a legitimate purpose does not give jail officials carte blanche to deprive incarcerated people of basic human needs. The conditions imposed must still be rationally related and not extreme in relation to the clamed purpose. *See Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (quoting *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999)). In other words, there must be a logical nexus between the claimed purpose and consequent deprivations imposed. *Hubbard*, 399 F.3d at 159-60 (*citing Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 992 (3d Cir. 1983)).

Here, Plaintiffs plausibly allege that no such logical nexus existed and that the conditions were needlessly extreme. First, the extremity of trapping people in freezing temperatures, restricting access to proper light and hygiene, and shutting off all contact with the outside world for the duration at issue in Plaintiffs' Complaint is not only unjustifiable, but it is axiomatic that the rationality of these measures cannot be resolved at the pleading stage. Put differently, drawing all reasonable inferences in Plaintiffs' favor, a trier of fact could find that no logical nexus exists between discouraging synthetic marijuana use and subjecting detainees to freezing cold and depriving them of communication with counsel and the outside world. As explained *supra*, courts have repeatedly held that similar deprivations of light, heat,

and water pose an objectively serious risk of harm for purposes of the Eighth Amendment. It follows that these deprivations are also extreme for pretrial detainees who cannot be punished at all, even if some legitimate penological interest did exist. Furthermore, Defendants also fail to engage with their persistent refusal to take adequate measures to stop the smuggling of contraband by their own staff, as alleged in the Complaint. *See* Compl. ¶¶ 46-47. A jury could reasonably rely on the Defendants' failure to take these more obvious alternative measures to find their chosen measures irrational. *See, e.g.*, *Ramirez v. Pugh*, 486 F. Supp. 2d 421, 426 (M.D. Pa. 2007) (existence of reasonable alternatives is relevant to whether defendant's action is rationally related to legitimate penological interest).

At the motion to dismiss stage, the relevant inquiry is not whether Plaintiffs can ultimately prove their claims, but whether the Complaint contains sufficient factual matter, accepted as true, to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Plaintiffs' allegations must be taken as true for the purposes of this motion, and they more than adequately establish Eighth and Fourteenth Amendment violations under applicable Third Circuit precedent.

### c. Plaintiffs have sufficiently alleged First Amendment free exercise of religion and Religious Land Use and Institutionalized Persons Act claims

The First Amendment protects the free exercise of religion, provided that the asserted beliefs are both sincerely held and religious in nature. *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc). When these predicate conditions are met, Free Exercise claims brought by incarcerated individuals are evaluated under the standard of *Turner v. Safley,* 482 U.S. 78 (1987). In such claims, courts within the Third Circuit inquire whether the plaintiff had alternative means of practicing their religion. *Id*. at 55. In *Sutton v. Rasheed*, the Third Circuit held that depriving followers of the Nation of Islam of specialized religious texts violated the Free Exercise Clause, even where plaintiffs retained access to other religious materials, such as the Qur'an. 323 F.3d 236, 255 (3d Cir. 2003), *as amended* (May 29, 2003). The court explained that "while the plaintiffs had access to the Bible and Qur'an, and could pray in their cells and celebrate Ramadan and other religious holidays, they were deprived of texts which provide critical religious instruction and without which they could not practice their religion generally." *Id*.

The Religious Land Use and Institutionalized Persons Act (RLUIPA) offers still greater protections for the religious liberties of incarcerated individuals than the First Amendment. Under RLUIPA, a plaintiff bears the burden of demonstrating that a prison policy or official action has substantially burdened their religious exercise.

*Washington v. Klem*, 497 F.3d 272, 278 (3d Cir. 2007). A substantial burden exists where: (1) the individual is forced to choose between following a religious precept and forfeiting generally available benefits, or (2) the government places substantial pressure on the individual to significantly modify their behavior in violation of sincerely held religious beliefs. *Id.* at 280. While courts may inquire into the sincerity of an inmate's religious beliefs, RLUIPA prohibits courts from questioning whether a particular belief or practice is central to the individual's faith or from evaluating the truth of the religious assertion. *Robinson v. Superintendent Houtzdale SCI*, 693 F. App'x 111, 115 (3d Cir. 2017). If a plaintiff makes the threshold showing of a substantial burden, the burden shifts to the government to demonstrate that its action (1) furthers a compelling governmental interest and (2) is the least restrictive means of furthering that interest. *Id* at 114. This is a strict scrutiny standard, broader than that imposed by the First Amendment, and places a significant burden on prison officials to justify their actions. *Id.* at 117.

In this case, Plaintiffs were deprived of all religious texts and denied access to any form of religious services for at least one month, and in some cases up to three months. Unlike the plaintiffs in *Sutton*, the individuals confined in the RHU had no means of practicing their religion at all. The Complaint specifically explains that, at DCP, electronic tablets are the sole mechanism through which incarcerated individuals can access reading materials, receive mail, participate in educational and

mental health programming, and engage in religious practices, including reading sacred texts and attending religious services. At the time of the deprivation, DCP did not offer any in-person religious services or chaplain support. By confiscating these tablets from every individual in the RHU, Defendants effectively deprived Plaintiffs of access to loved ones, legal counsel, rehabilitative programming, and religious exercise. *See* Compl. ¶¶ 67–76. For instance, following the seizure of all tablets, Plaintiff Kani Little was unable to practice his Christian faith, as the tablet was the only available means for him to access the Bible and other religious resources, and no other forms of religious practice were available to him.

Defendants argue that the First Amendment right to free exercise of religion may be curtailed by valid penological objectives and the realities of incarceration. *Cf.* Defs.' Br. 20-21. While this may be accurate as a general principle, Defendants fail to provide any meaningful legal analysis. As an initial matter, a jury could conclude that Defendants' actions here were motivated solely by spite, not by any "legitimate penological interest," *Sutton*, 323 F.3d at 525; *see supra* § II.c. To the extent Defendants were seeking to advance a legitimate interest in curbing smoking, they merely assert that a rational connection exists between the seizure of tablets and that interest, but they offer no explanation of how those two things are logically connected. How is taking away a tablet stop reasonably calculated to someone from smoking? Defendants do not explain. They certainly do not explain how taking away

24

the tablets of *everyone in a particular housing unit*, without regard for which individuals were or were not smoking, is somehow a reasonable anti-smoking measure. In other words, Defendants' defense to Plaintiffs' First Amendment free exercise claims rests on a conclusory factual assertion—that mass deprivations of tablet access are reasonably calculated to stop smoking—that makes little sense and cannot be deemed reasonable as a matter of law on a motion to dismiss.

Defendants' argument also misapplies the legal framework under RLUIPA, incorrectly invoking First Amendment jurisprudence that focuses on whether alternative means of religious exercise were available. However, under RLUIPA, the existence of alternative forms of religious practice is not dispositive. As the Supreme Court made clear in *Holt v. Hobbs*, the proper inquiry under RLUIPA is whether the government has substantially burdened the religious exercise of the claimant—in which case the government must demonstrate that it is the least restrictive means of achieving a compelling government interest—not whether other forms of religious exercise remain available. *See* 574 U.S. 352, 361-62 (2015) ("RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . , not whether the RLUIPA claimant is able to engage in other forms of religious exercise."). For these reasons, Defendants' arguments must fail, as Plaintiffs' Complaint has satisfied the elements required of both the First Amendment and RLUIPA.

25

### d. Plaintiffs have sufficiently alleged Americans with Disabilities Act and Rehabilitation Act claims

Title II of the Americans with Disabilities Act ("ADA") imposes liability on "public entities," which include "any State or local government," as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. § 12131. This provision extends to correctional institutions. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998). Similarly, the Rehabilitation Act applies to any entity that receives federal financial assistance. *Id.* (citing 29 U.S.C. § 794(a), Section 504 of the Rehabilitation Act).

The standards for liability under the ADA and the Rehabilitation Act are functionally equivalent and are interpreted consistently. *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 166- 67 (3d Cir. 2015); *Yeskey*, 118 F.3d at 170 ("Congress has directed that Title II of the ADA be interpreted in a manner consistent with Section 504 [of the Rehabilitation Act], 42 U.S.C. § 12134(b), 12201(a)"). To establish a violation of Title II of the ADA, an incarcerated plaintiff must allege: (1) that they are a qualified individual with a disability; (2) that they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of their disability. *Mutschler v. SCI Albion CHCA Health Care*, 445 F. App'x 617, 621 (3d Cir. 2011) (citing 42 U.S.C. § 12132).

Notably, the ADA prohibits discrimination based on disability—it does not merely provide a cause of action for inadequate treatment. *Kokinda v. Pa. Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016). However, courts have recognized that "discrimination under the ADA [and the Rehabilitation Act] encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). The law is well-settled that "[a] prison's refusal to accommodate inmates' disabilities in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitutes a denial of the benefits of a prison's services, programs, or activities under Title II." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 290 (3d Cir. 2019) (citing *United States v. Georgia*, 546 U.S. 151, 157 (2006)). Importantly, "a prisoner's misconduct does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and the RA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there." *Furgess*, 933 F.3d at 291. Moreover, courts have drawn a critical distinction between inadequate care and outright denial of services. For example, in *McPherson v. County of Dauphin*, the court permitted an ADA and RA claim to proceed where the plaintiff alleged that DCP failed to provide any access to essential medications, constituting a total denial of medical care and

therefore a failure to provide reasonable accommodations. *McPherson v. Cnty. of Dauphin*, No. 1:19-CV-01865, 2020 WL 1558206, at *3 (M.D. Pa. Mar. 24, 2020).

Here, Defendants subjected individuals with disabilities to the extreme conditions of the blackout and deprived them of tablets—tools that, for many, provided the only available means of accessing mental health treatment materials aside from medication. In doing so, DCP engaged in an "outright denial" of critical medical and mental health services, not merely substandard care. On top this, by imposing freezing cold and dark conditions, restricting Plaintiffs' freedom of movement to solely within their cells, and depriving Plaintiffs of basic hygiene, Defendants failed to provide the "fundamentals" necessary for accommodating disabilities. Compl. ¶¶ 283-288. Plaintiffs have therefore plausibly alleged that these denials constituted a failure to provide reasonable accommodations under the ADA and the Rehabilitation Act.

Defendants assert that Plaintiffs' claims fail because: (1) no action taken by Defendants was to exclude them from any benefit on the basis of disability; and (2) the Mental Health subclass was treated no differently than other individuals housed in the RHU without disabilities. *Cf.* Defs.' Br. 30. Defendants further characterize Plaintiffs' assertions as conclusory, but fail to support this claim with legal authority or to specifically address Plaintiffs' factual allegations. Defendants' arguments fail because the legal standard asks whether there was a failure to accommodate

disability—which Plaintiffs fully allege in their Complaint—and not whether Plaintiffs' disability was the *reason* for the actions taken by the Defendants. Plaintiffs have sufficiently alleged they are qualified individuals with disabilities, were excluded from programs, services, and activities at DCP, and that this exclusion was the result of the failure of DCP to provide reasonable accommodations for their disabilities.

### e.  Plaintiffs have sufficiently alleged municipal liability claims

Plaintiffs' claims regarding municipal liability have been addressed in satisfactory factual detail to survive Defendants' motion to dismiss. Municipal liability under Section 1983 can be established when the constitutional injury is caused by the execution of a governmental policy or custom. As the Third Circuit has previously held, a city can be held liable when the injury inflicted results from an official policy or custom. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). In *Andrews*, the Third Circuit further clarified that liability attaches to a municipality only when a government policy, or the acts of officials who represent official policy, directly causes the injury. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). The existence of a custom can be established by proving "knowledge and acquiescence" in the actions at issue. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).

Further, under the Third Circuit's Jury Instruction 4.6.5, liability may arise if a policymaker has "agreed after the fact" to a subordinate's decision to engage in a constitutional violation. 3d Cir. Model Civ. Jury Instr. § 4.6.5 (2024). This can occur when a subordinate's decision is subject to review by the municipality's authorized policymakers, who possess the authority to evaluate the conduct for conformity with official policies. If those policymakers approve or ratify the decision, this ratification is chargeable to the municipality as an official act. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *see also Brennan v. Norton*, 350 F.3d 399, 427-28 (3d Cir. 2003). In such cases, a policymaker's "agreement after the fact to a subordinate's decision to engage in the violation" may provide a basis for municipal liability. 3d Cir. Model Civ. Jury Instr. § 4.6.5 (2024).

Plaintiffs' Complaint describes how the Dauphin County Prison Oversight Board are charged with the safekeeping and discipline of the facility. Compl. ¶¶ 32–34. The board is additionally responsible for appointing and supervising the warden. *Id*. Plaintiffs establish that the board was on full notice about the well-known and documented problems the facility was experiencing. *Id.* ¶¶ 35–41. These allegations establish the requisite knowledge and foundation for municipal liability.

### f. Plaintiffs have sufficiently alleged excessive force claims under the Fourteenth Amendment

The legal standard for excessive force under the Fourteenth Amendment requires Plaintiffs to demonstrate that the force used was objectively unreasonable. In assessing the reasonableness of force, courts consider the relationship between the need for the use of force and the amount of force applied, the extent of the injury, any efforts made by the officer to temper or limit the force used, and whether the plaintiff was actively resisting. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Defendants assert that Pierre and Lucas cannot be held liable because they were not personally involved in the use of force. *Cf.* Defs.' Br. 26. However, Plaintiffs incorporate and rely on the arguments made in the Eighth and Fourteenth Amendment sections of this motion, which demonstrate that these Defendants had sufficient involvement to be liable under both constitutional provisions because they authorized and/or acquiesced in the excessive use of force against Mr. Little. Compl. ¶¶ 159–172. Defendants also argue that Skelton cannot be held responsible for deploying mace because it did not cause lasting injury, and because Little allegedly refused two orders to lock in his cell. *Cf.* Defs.' Br. 26-27. Again, the Defendants are improperly asking this Court to resolved disputes of material fact at the pleading stage. Accepting the allegations in the Complaint as true, as the Court must at this stage, the assault on Mr. Little while he was handcuffed and posing no physical

threat to anybody meets the standard of plausibly alleging an objectively unreasonable use of force. Compl. ¶¶ 153-177.

Finally, Defendants argue that no failure to intervene has been adequately alleged because twelve riot gear guards "stormed" the unit and assaulted Little. *Cf.* Defs.' Br. 27. Defendants seem to imply that Defendants Briggs, Pierre, and Skelton were unable to intervene due to the number of officers involved and the rapid pace of the assault. But the Complaint alleges that Defendants Briggs, Pierre, and Skelton, were supervisory officials who therefore necessarily had *the authority to give orders to their subordinates*, including an order to cease using force. Compl. ¶¶ 23, 24, 26. Unless Defendants are suggesting that the Court should hold that they have so little institutional control that their subordinates would defy their orders as a matter of law, then they plainly had a reasonable opportunity to intervene by giving direct verbal orders to their subordinates in their presence. Their failure to do so suffices to state a claim for failure to intervene at the pleading stage. *See A.M.*, 372 F.3d at 587 (correctional officer who has reasonable opportunity in use of excessive force by fellow officers but fails to do so is liable for failure to intervene).ls

## V.    Conclusion

For the reasons argued in this brief, this Court should deny Defendants' motion to dismiss in its entirety.

32

ABOLITIONIST LAW CENTER

/s/ *Bret Grote*
/s/ *Margaret Hu*\*
Abolitionist Law Center
990 Spring Garden, Suite 306
Philadelphia, Pennsylvania 19123
(412)654-9070
bretgrote@alcenter.org
margo@alcenter.org

KAUFMAN LIEB LEBOWITZ & FRICK
LLP

/s/ *Douglas E. Lieb*\*
Douglas E. Lieb
18 East 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
dlieb@kllf-law.com

\* Admitted *pro hac vice*

Dated:        April 15, 2025

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Response in Opposition to Defendants' Motion

to Dismiss the Complaint was filed via the Court's Electronic Filing System and

thereby served upon all parties of record.


/s/ Margaret Hu