## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

KANI LITTLE, *et al.*

Plaintiffs,

v.

DAUPHIN COUNTY, *et al.*,

Defendants.

CIVIL ACTION NO. 4:24-CV-2169

(Judge Mehalchick)

(Magistrate Judge Latella)

## REPORT AND RECOMMENDATION

### I.    Introduction

This action challenges the conditions of confinement at the Dauphin County Prison's (DCP) Restrictive Housing Unit (RHU) during a period of time within 2023 and 2024.  The three named plaintiffs, who were confined in the DCP RHU during the relevant time period, bring suit on behalf of themselves and others similarly situated, seeking class certification, declaratory and compensatory relief as well as punitive damages and attorneys' fees.  The Plaintiffs allege that sometime in late 2023, DCP officials perceived a problem with inmates smoking synthetic marijuana in the RHU and responded with a lengthy course of retaliatory conduct that exceeded the bounds of humane treatment and that violated their civil, constitutional, and numerous statutory rights.  Plaintiffs allege, *inter alia*, that they were: subjected to retaliatory excessive force; denied basic essential hygiene

1

products such as soap, toothpaste, toilet paper, contact lens solution, and showers (among other things) for lengthy periods of time; denied any heat and electricity in the dead of winter; denied potable water; denied access to religious services and religious material; denied legal visits and access to the law library and their own legal material; and, that they did not have their medications distributed properly or at times distributed at all.  The Complaint raises eight separate causes of action and seeks class certification, declaratory relief, compensatory and punitive damages as well as attorneys' fees.

The Defendants, in turn, deny Plaintiffs' assertions and maintain that DCP officials acted appropriately in addressing the problem of synthetic marijuana and that their actions were in pursuit of legitimate governmental interests, namely, prison safety.  Defendants assert that Plaintiffs' claims are "unsupported by factual allegations and rely on 'belief' to insufficiently plead their claims."  (Doc. 21, p. 11).[1]  Accordingly, they seek dismissal of Plaintiffs' claims with prejudice. Defendants also maintain that Plaintiffs' request for class certification is untimely and improper and should therefore be denied.

The matter now comes before the Court on Defendants' Motion to Dismiss. For the reasons that follow, it will be recommended that Defendants' request to

---

[1] References to page numbers throughout are referencing the page number in the docket header, not the page number listed on the filed brief.

deny class certification be DENIED; that the Motion to Dismiss as to Plaintiffs'
claims under the Americans with Disabilities Act and the Rehabilitation Act be
GRANTED, but without prejudice and Plaintiffs granted leave to file an amended
complaint; and, that the Motion to Dismiss be DENIED as to all remaining claims.

## II.    Procedural History

This counseled civil rights matter was initiated by the filing of a Complaint
on December 17, 2024.  (Doc. 1).  The named Plaintiffs are Kani Little, Hector
Ramos, and James Patterson, all of whom were confined in the Restrictive Housing
Unit (RHU) at the Dauphin County Prison (DCP) at one time prior to the filing of
the Complaint.  The Complaint makes a request for class certification.[2]  Named as
Defendants are Dauphin County; Gregory Briggs, Warden of DCP; Lionel Pierre,
Chief Deputy Warden of Security at DCP; Roger Lucas, Custody Major at DCP;
Mark Skelton, Lieutenant at DCP; and John Does, 1–23, correctional staff
members at DCP in December, 2023.

Waiver of Service was returned by Defendants Dauphin County, Gregory
Briggs, Lionel Pierre, Roger Lucas, and Mark Skelton on January 10, 2025.  (Doc.
7).  These Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P.
12(b)(6) on February 18, 2025.  (Doc. 16).  Having been granted an extension of

---

[2]  As of yet, no motion for class certification has been filed.

time in which to do so, Defendants filed a brief supporting their motion on March 18, 2025.  (Doc. 21).  Plaintiffs, also having been granted an extension of time, filed an opposing brief on April 15, 2025.  (Doc. 26).  After the briefing deadline was extended, Defendants reply brief was filed on May 9, 2025.  (Doc. 29).  The Motion to Dismiss has been fully briefed by the parties and is ripe for disposition.

## III.    Background

Plaintiffs Kani Little, Hector Ramos, and James Patterson were all detainees[3] at the Dauphin County Prison at some point in 2023 through 2024 and were confined in the Restrictive Housing Unit for periods ranging from approximately three to five months.[4]  (Doc. 1, ¶¶ 19–21).  The Complaint alleges that during that time, the Plaintiffs were subjected to inhumane conditions and suffered various violations of their constitutional and statutory rights.  Specifically, the Complaint alleges that in late 2023, DCP officials perceived a problem with inmates who were confined in the RHU smoking synthetic marijuana.  (Doc. 1, ¶¶ 1–3).  Plaintiffs allege that in response, DCP officials "lashed out with an escalating campaign of collective punishment against the incarcerated people for

---

[3] Named Plaintiffs and the putative class members fall into two categories: pretrial detainees and post-sentence prisoners.

[4] The precise section of the prison involved in this action is identified by the Plaintiffs as "three sub-basement units on P-Block, specifically designated as P-3, P-5, and P-6." (Doc. 1, ¶ 61).

whose well-being they are responsible." (Doc. 1, ¶ 4). The Complaint first makes more general allegations regarding these purported conditions applicable to the three putative class representatives and the putative class; subsequently, more specific allegations regarding each named plaintiff are set forth. A summary of the general allegations will be provided followed by a summary of the allegations made by each named plaintiff. The more general allegations can be grouped into three broad categories: 1) confiscation of tablets leading to deprivation of access to religious, educational, legal and health related materials as well as any communication with the outside world; 2) confiscation of personal belongings resulting in deprivation of legal documents, warm clothing, sheets and basic hygiene items; and 3) a "blackout" period where the heat and electricity were cut off, clean water was not readily available, medication administered inconsistently and recreational time and showers denied.

### A. General Allegations of All Plaintiffs

#### 1. Deprivation of Tablets

Plaintiffs allege that DCP staff seized the tablets of all inmates housed on RHU Blocks P-3, P-5, and P-6 on November 16, 2023. (Doc. 1, ¶ 67). They maintain "on information and belief" that this was done at the direction of Defendants Briggs and Pierre who were aware of the seizure. (*Id.* at ¶ 69). Plaintiffs state that tablets were withheld from at least six weeks to three months.

(*Id.* at ¶ 76).  The deprivation of tablets, according to the Complaint, also resulted in the deprivation of inmates' rights.

Due to problems with drugs getting into the prison, DCP uses a third-party processing facility to scan and then upload outside mail to inmates' tablets.  (Doc. 1, ¶¶ 42–44).  According to the Complaint, DCP inmates are not allowed access to physical reading material: all communication with anyone outside the facility, "recreational, mental health, educational, law library materials," and "religious texts, including the Bible, the Quran, prayer guidance, and other critical materials, are only available via tablet access."  (*Id.* at ¶¶ 71–74).  Therefore, Plaintiffs complain that "[w]ithout tablets, everyone on P-3, P-5, and P-6 was left without any access to religious texts, law library, inmate handbooks, phone calls, or any incoming mail, including legal mail."  (Doc. 1, ¶ 69).

## 2.  Deprivation of All Personal Belongings & Legal Paperwork

Plaintiffs allege that on November 21, 2023, DCP officials seized all personal belongings, including legal paperwork from inmates housed Blocks P-3, P-5, and P-6.  (Doc. 1, ¶¶ 77–88).  According to the Complaint, Plaintiffs were left without "hygiene products (including toilet paper, soap, toothpaste, contact solution and cases, deodorant, lotion, shampoo, conditioner, baby powder, and hair combs), legal paperwork, writing materials, extra clothing (including thermals),

sneakers, sheets, pillows, and blankets." (*Id.* at ¶ 79).  They allege that following the seizure, some Plaintiffs received select products of indigent grade quality, while others did not receive hygiene products, including toothpaste and toothbrushes, at all.  (*Id.* at 81–83).  They allege that they had limited and insufficient access to toilet paper, all causing deterioration of inmates' personal hygiene.  (*Id.* at 84–86).  Plaintiffs also claim that they could not put in grievances or sick call requests as they had no writing instruments.  (Doc. 1, ¶ 87).

### 3.  The "Blackout," Denials of Heat and Electricity, Clean Water, Showers and Recreational Time

Plaintiffs assert that following the seizure of all of their personal belongings in November, 2023, DCP staff, with the approval of Defendants Briggs and Pierre,[5] required RHU inmates to remain in the cells for ten days without any recreational time or access to showers.  (Doc. 1, ¶ 89).  After the purported ban on showers was lifted, inmates were allowed showers every three days.  (*Id.* at ¶ 92).  Plaintiffs allege that the shower facilities were "mold caked" and infested with flies, and that the 15-minute shower periods were the only time that they were let out of their cells.  (*Id.* at ¶¶ 93–94).  Additionally, Plaintiffs assert that they were held in their cells for a month-long period without any recreation time: during that month, they

---

[5] The allegations against Briggs and Pierre are made "on information and belief," something that the Defendants take issue with, and which will be discussed below.

were allowed out of their cells for a total period of time of two hours. (*Id.* at ¶¶ 96–97).

Plaintiffs next allege that prison staff told inmates that Defendants Briggs and Pierre directed that "all electrical power be cut off to RHU units P-3, P-5, P-6." (Doc. 1, ¶¶ 99–101). Accordingly, they say, the power was cut off from approximately December 2, 2023, until December 19, 2023. (*Id.* at ¶ 105). The Complaint alleges that heat and light were cut off during the winter and temperatures regularly dropped below freezing. (*Id.* at ¶ 107). They also maintain that prison officials had previously seized all sheets, pillows, and warm clothing so that inmates resorted to cutting their plastic mattresses and enrobing themselves in it to protect themselves from the cold. (*Id.* at ¶¶ 109–11). Because the power was cut off, they allege, Plaintiffs lived in "near-total darkness." (*Id.* at ¶ 112). This also meant that during this period, they could not see or inspect their food, which Plaintiffs report was infested with bugs and debris. The lack of light and heat allegedly resulted in Plaintiffs' physical and mental deterioration.

They claim that during this period, their water supply had also been cut off: without access to clean water, inmates were unable to wash, flush the toilets, or have access to potable water. (Doc. 1, ¶¶ 118–22). During this period, the only access to clean water came from the prison staff, which, Plaintiffs maintain, distributed it in limited quantities, if at all. (*Id.* at ¶¶ 123–24). Lastly, it is alleged

8

that during this time, which Plaintiffs refer to as a "blackout," medication was distributed at the wrong time intervals or not at all, resulting in inmates missing doses of their medication. (*Id.* at ¶¶ 125–29).

## B. Specific Allegations Made by Each Named Plaintiff

### 1. Kani Little

Kani Little (Little), a 27-year-old who suffers from anxiety and depression,[6] was a pretrial detainee at DCP from December 19, 2022, until sometime in March, 2024. (Doc. 1, ¶¶ 19, 132–33). He alleges himself to be a "devout and practicing Christian" who prays and reads scripture daily. (*Id.* at ¶ 134). Little was sent to the RHU, Block P-6, in October, 2023. (*Id.* at ¶ 135). Little alleges that his tablet was taken away for three months and that prevented him from practicing his religion because the tablet was his only access to scripture and prayer guidance. (*Id.* at ¶ 137). Without his tablet, Little alleges that he had no access to the law library or means of communicating with either his lawyer or his loved ones. (*Id.* at ¶ 138). Little also complains that all of his personal items were seized, as discussed above, and that he suffered the resulting harms referenced above. (*Id.* at ¶¶ 139–45). He also alleges to have suffered the consequences of the alleged "blackout" where he was deprived of light and heat. (*See* Doc. 1, p. 18). Little

---

[6] He alleges that he takes two medications for these conditions.

alleges that during the "blackout," his medications were not distributed properly and that the combined effects of not taking his medication consistently plus the cold and dark resulted in sleeplessness and a worsening of his mental condition. (*Id.*).

Plaintiff Little also alleges having been assaulted by multiple guards while confined in the RHU.  (Doc. 1, p. 22).  He asserts that on December 8, 2023, while being escorted to his cell after being seen at the medical unit, he complained to the guard about the alleged "extreme deprivations" that he and his fellow inmates were suffering.  (*Id.* at ¶¶ 153–54).  He states that in protest of the RHU conditions, he refused to be locked in his cell.  (*Id.* at ¶ 156).  The Complaint alleges that while he was standing outside his cell, he was approached by Defendants Lieutenant Mark Skelton, Custody Major Roger Lucas, and Deputy Warden Lionel Pierre, who turned a deaf ear to his request for better conditions.  (*Id.* at ¶¶ 159–61).  Plaintiff alleges that after the conversation, while handcuffed to a belt around his waist, he was made to face the wall and assaulted by 12 guards in riot gear (John Doe Defendants 1–12), who smacked him with riot shields and threw him to the ground.  (*Id.* at ¶¶ 162–64).  Plaintiff avers that he was knocked unconscious and woken up with mace sprayed in his face, only to be carried to Block P-3, stripped, and beaten and maced again.  (*Id.* at ¶¶ 167–71).  He alleges that the purported first assault occurred in the presence of Defendants Pierre, Lucas, and Skelton, and the

10

second assault was in the presence of Defendants Lucas and Pierre, and that on both occasions, none of these defendants did anything to intercede. (Doc. 1, p. 20). Little complains that he received inadequate medical care after the incident and that he still suffers nerve damage as a result of the alleged assault. (*Id.* at p. 21).

### 2. Hector Ramos

Plaintiff Hector Ramos (Ramos), age 38, was a detainee at DCP from October 18, 2023, through January 10, 2024. He was confined in the RHU, Block P-6, from October 27, 2023, through January 10, 2024. (Doc. 1, ¶¶ 20, 183). He allegedly suffers from schizophrenia and depression and is medicated for those conditions. (*Id.*). Ramos purports to be a Christian whose practices include reading scripture, praying, and listening to sermons. (*Id.* at ¶ 185). He complains that while at DCP he was never given a tablet and had no access to religious material, the law library, or contact with loved ones. (*Id.* at ¶¶ 187–91). Ramos also complains that all of his personal items, including hygiene items and clothing, were seized as outlined above, and that he went weeks without any toilet paper, soap, toothbrushes, and toothpaste. (*Id.* at pp. 23–24). He alleges that he was subject to the lack of heat, light, and drinking water described above. All of this, he maintains, resulted in the deterioration of his personal hygiene and physical and mental wellbeing. He also alleges that during the "blackout" he missed doses of his medication and that it was not administered on a regular basis. (*Id.* at p. 25).

### 3. James Patterson

James Patterson (Patterson) is a 33-year-old who was detained at DCP from 2019 through 2024; he spent the last five months of his incarceration at DCP in the RHU, Block P-6. (Doc. 1, ¶ 221). Patterson professes to be a devout Christian who reads the Bible and engages in prayer throughout the day. (*Id.* at ¶ 223). He alleges that his tablet was taken from November 16, 2023, until December 16, 2023, and that he therefore had no access to religious services, the ability to read the Bible or follow guided prayer. (*Id.* at ¶ 223–24). He also had no access to the law library and other educational materials, or the ability to receive letters of emails from his lawyer. (*Id.* at ¶¶ 225–27). He claims that he was denied access to his lawyer for at least one month while he was in the midst of the sentencing process, (*id.* at ¶¶ 227–28), and he says that when his lawyer came to visit him during the "blackout," he was denied a legal visit. (*Id.* at ¶ 229). Like the others, he alleges that his hygiene products were taken away and for weeks he "was entirely deprived of hygiene products including no access to a toothbrush or toothpaste whatsoever." (*Id.* at ¶ 234). He also asserts that his contact lens solution and case were seized and that he resorted to sleeping in his contacts resulting in discomfort. (*Id.* at ¶ 237). He also alleges to have suffered light and heat deprivation during the "blackout" and the cumulative effects of these conditions resulted in a deterioration of his mental health. (*Id.* at pp. 28–29).

## IV.    Discussion

Plaintiffs seek class certification on behalf of "all persons confined at Dauphin County Prison in Units P-3, P-5, and/or P-6 of the Restrictive Housing Unit at any point from November 16, 2023, to December 19, 2023."  (Doc. 1, ¶ 254).  They also seek to represent three subclasses consisting of 1) all class members whose federal constitutional claims concerning the deprivation of basic needs arise under the Fourteenth Amendment, including pretrial detainees; 2) all class members whose federal constitutional claims concerning the deprivation of basic needs arise under the Eighth Amendment, including sentenced prisoners; and, 3) all class members who had a mental health diagnosis during the class period. (Doc. 1, p. 30).  Plaintiffs raise eight separate causes of action in addition to their request for class certification.  Defendants seek to dismiss all claims as well as the request for class certification.  Each claim will be discussed *seriatim* after a discussion of Defendants' request to deny class certification.

### A. Class Certification

As discussed above, the Complaint seeks class certification on behalf of all persons confined in Units P-3, P-5, and/or P-6 of the RHU at any point from November 16, 2023, to December 19, 2023, and for three distinct subclasses. Defendants maintain that class certification should be denied because a timely

motion for class certification was not made in violation of our Local Rules. They

argue: "Moving Defendants should not be forced to litigate the issue of class

certification until the Plaintiffs file a motion for certification."[7] (Doc. 21, pp. 6–7).

Defendants nevertheless address the certification request on its merits "out of an

abundance of caution" (*id.* at p. 7) and assert that the request fails to meet the

requirement of Federal Rule of Civil Procedure 23. Plaintiffs acknowledge that a

motion for class certification has not yet been filed but argue that filing a motion

prior to any discovery would be improper and premature. (*See* Doc. 26, pp. 5–6).

Because a ruling of Plaintiffs' request for class certification at this point in the

litigation would be premature, for the reasons that follow, it will be recommended

that Defendants' request to deny certification be denied without prejudice to raise

the issue when Plaintiffs file a motion for class certification.

Class actions are governed Federal Rule of Civil Procedure 23. Rule 23

does not provide a specific timeframe in which class certification must be sought;

it simply provides that "[a]t an early practicable time after a person sues or is sued

as a class representative, the court must determine by order whether to certify the

action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Although the Rule sets no

---

[7] Defendants also note that the Caption of the Plaintiffs' Complaint fails to
designate it as a class action as required by the local rules. This minor technical
error is less concerning because it is very clear from the body of the Complaint that
it is a putative class action.

time limit, "when feasible, the certification decision should be made promptly.  To

that end, some district courts have adopted local rules providing a specific time

within which a party must move for a class determination."  5C Wright, Miller &

Kane, Fed. Prac. & Proc. Civ. § 1785.3 (3d ed.).  Our Court has done just that.  The

Local Rules for the Middle District of Pennsylvania require that:

> Within ninety (90) days after filing of a complaint in a class action,
> unless this period is extended on motion for good cause appearing,
> the plaintiff shall move for a determination under subdivision
> (c)(1) of Fed. R. Civ. P. 23, as to whether the case is to be
> maintained as a class action. In ruling upon such a motion, the
> court may allow the action to be so maintained, may disallow and
> strike the class action allegations, or may order postponement of
> the determination pending discovery or such other preliminary
> procedures as appear to be appropriate and necessary in the
> circumstances. Whenever possible, where it is held that the
> determination should be postponed, a date will be fixed by the
> court for renewal of the motion before the same judge.

*See* L.R. 23.3.  As explained in Wright & Miller, the failure to comply with the

filing requirement provided for in a court's local rules:

> …has resulted in the dismissal of the class allegations on the
> ground that it demonstrated that the attorneys could not adequately
> represent the class.  In general, however, the untimeliness of a
> class-certification motion, in and of itself, will not justify denying
> class status to the action.  Rather, the delay will be evaluated in
> light of the circumstances of the case and certification will be
> denied only when the late timing of the determination may cause
> prejudice or unduly complicate the case.

5C Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 1785.3 (3d ed.).

The determination as to whether to certify a class action is no simple task and it is nearly impossible to make such a determination based solely on the allegations contained in a complaint.  The Third Circuit has recognized that:

> To determine whether there is actual conformance with Rule 23, a district court must conduct a rigorous analysis of the evidence and arguments put forth . . . When doing so, the court cannot be bashful. It must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action. Rule 23 gives no license to shy away from making factual findings that are necessary to determine whether the Rule's requirements have been met.

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (cleaned up). For this reason, "[a]s a practical matter, the court's determination under subdivision (c)(1) usually should be predicated on more information than the complaint itself affords.  Thus, courts frequently have ruled that discovery relating to the issue whether a class action is appropriate needs to be undertaken before deciding whether to allow the action to proceed on a class basis."  5C Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 1785.3 (3d ed.).  *See also Seplow v. Closing Pro, Inc.*, 717 F. Supp. 3d 427, 436 (E.D. Pa. 2024) ("[C]lass allegations are rarely struck prior to the class certification stage."); *Ehrhart v. Synthes (USA)*, No. CIV.A. 07-01237(SDW), 2007 WL 4591276, at *5 (D.N.J. Dec. 28, 2007) (denying as premature a motion to dismiss a class action allegations, noting that dismissal "at this stage should be done rarely").

In their Reply Brief, Defendants argue that because Plaintiffs have not filed for class certification within 90 days as required by the local rules, they must demonstrate "that their untimely filing was due to excusable neglect and that there be good cause," citing *Hart v. Gov't Emps. Ins. Co.*, No. 4:21-CV-00859, 2023 WL 3022514 (M.D. Pa. Apr. 20, 2023) in support of that argument.  Yet in *Hart*, the Court excused a nearly two-year delay for the very same reason Plaintiffs here seek justification for the delay: the need for discovery.  The Court in *Hart* stated:

> The Court notes that the United States Court of Appeals for the Third Circuit has observed tension between Local Rule 23.3's ninety-day deadline and Federal Rule of Civil Procedure 23(c)(1)(A)'s requirement that parties to "present the court with sufficient information to support an informed decision on certification." As "[p]arties need sufficient time to develop an adequate record," a deadline on motions for certification may unduly rush the resolution of "sufficient time to develop an adequate record." That said, the Court also notes that Local Rule 23.3 provides that the ninety-day period may be extended for good cause shown.

*Id.* at * 1 (quoting *Richardson v. Bledsoe,* 829 F.3d 273, 284 (3d Cir. 2016)).  In addition to excusing the delay based on the good cause of the need for discovery, the Court relied on the fact that the request for class certification was evident in the filings, as it is here, and therefore the defendant suffered no prejudice and the plaintiff did not act in bad faith and there is no evidence of such here.[8]  *See also*

---

[8] Local Rule 23.3 states that Plaintiff should move class determination "[w]ithin ninety (90) days after filing of a complaint in a class action, unless this period is extended on motion for good cause appearing . . . ."  While all of Plaintiffs'

*Sheller v. City of Philadelphia*, 288 F.R.D. 377, 381 (E.D. Pa. 2013) (refusing to deny class certification based on the failure to comply with "the letter" of the timeframe set forth in the local rules).

Based on the forgoing, it would be premature to dismiss Plaintiffs' class action allegations at this time.  It will be recommended that Defendants' request to deny certification be denied without prejudice to raise the issue when Plaintiffs file a motion for class certification.

### B. Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(6)

The Complaint raises eight separate causes of action.  Moving Defendants seek dismissal of those claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The standard of review will first be discussed.  Next, each of Defendants' arguments will be addressed *seriatim*.

#### 1. The 12(b)(6) Standard

Rule 8 of the Federal Rules of Civil Procedure states that a claim must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  This requires the Plaintiff to put forth

---

arguments regarding the time for a ruling on the merits of their request for class certification are well taken, the rule does provide for the possibility of an extension of time and none of these reasons justify a failure to seek an extension which would have avoided this issue entirely.

18

evidence that, "when taken as true, suggest[s] the required elements of a particular legal theory." *McNeilly v. City of Pittsburgh*, 40 F.Supp.3d 643, 650 (W.D. Pa. 2014). The Plaintiff must state "sufficient factual allegations which 'nudge' its claims 'across the line from conceivable to plausible.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680, 129 S. Ct. 1937, 1951, 173 L. Ed. 2d 868 (2009)). The purpose is to ensure "fair notice of the factual basis of a claim while raising a 'reasonable expectation that discovery will reveal evidence of the necessary element.'" *Id.* at 651.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This means that a complaint may be dismissed if it does not present sufficient facts to support a plausible claim: "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)).

The court must accept both the Plaintiff's allegations and any reasonable inferences that can be drawn as true and construe them in the light most favorable

to the non-moving party. *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). However, it need not accept "'unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Reciting the elements that make up a cause of action and supporting them with "mere conclusory statements" is insufficient to give those statements the presumption of truth. *McNeilly*, 40 F.Supp.3d at 650 (citing *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937).

When faced with a motion to dismiss pursuant to 12(b)(6), a court should conduct a two-part analysis: 1) separate the factual and legal elements of a claim; and 2) "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.* (internal citation removed). The court may consider facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellab, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). This analysis requires the court to look at the claims on a case-by-case basis and rely both "on its judicial experience and common sense." *McNeilly*, 40 F. Supp. 3d at 650. The court will not be reaching legal conclusions, but instead is merely determining "whether the plaintiff should be permitted to

offer evidence in support of the allegations." *Id.* (citing *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000)).

### 2. Counts 1 and 2: § 1983 Claims Regarding Living Conditions at DCP

The named Plaintiffs and putative class members in this matter fall into two categories: pretrial detainees and sentenced prisoners. Both groups were confined in the RHU Units P-3, P-5, and/or P-6 during the relevant time period. Both groups were allegedly subjected to the same conditions described above. While the analysis is similar, pretrial detainees' claims are raised under the Fourteenth Amendment and sentenced prisoners' claims under the Eighth Amendment. Defendants Briggs (Warden of DCP) and Pierre (Deputy Warden) seek to dismiss the claims related to the conditions of confinement, and argue 1) that the conditions did not violate the constitutional rights of either group, and 2) that the Plaintiffs failed to allege sufficient involvement on their part to establish liability. Each argument will be addressed in turn.

### a) Count 1: Pretrial Detainees' Conditions of Confinement

"[W]hen pretrial detainees challenge conditions of confinement, their claims must be analyzed under the Due Process Clause of the Fourteenth Amendment." *Hubbard v. Taylor*, 538 F.3d 229, 230 (3d Cir. 2008). In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court held that: "In evaluating the constitutionality of

21

conditions or restrictions of pretrial detention that implicate only the protection

against deprivation of liberty without due process of law, we think that the proper

inquiry is whether those conditions amount to punishment of the detainee.  For

under the Due Process Clause, a detainee may not be punished prior to an

adjudication of guilt in accordance with due process of law." *Id.* at 535.  The Court

provided guidance in determining whether prison conditions constitute

punishment:

> A court must decide whether the disability is imposed for the
> purpose of punishment or whether it is but an incident of some
> other legitimate governmental purpose. Absent a showing of an
> expressed intent to punish on the part of detention facility officials,
> that determination generally will turn on whether an alternative
> purpose to which the restriction may rationally be connected is
> assignable for it, and whether it appears excessive in relation to
> the alternative purpose assigned to it. Thus, if a particular
> condition or restriction of pretrial detention is reasonably related
> to a legitimate governmental objective, it does not, without more,
> amount to punishment. Conversely, if a restriction or condition is
> not reasonably related to a legitimate goal—if it is arbitrary or
> purposeless—a court permissibly may infer that the purpose of the
> governmental action is punishment that may not constitutionally
> be inflicted upon detainees qua detainees. Courts must be mindful
> that these inquiries spring from constitutional requirements and
> that judicial answers to them must reflect that fact rather than a
> court's idea of how best to operate a detention facility.

*Id.* at 538–39 (cleaned up).  The Third Circuit provided further guidance in

applying this standard in *Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984 (3d

Cir. 1983) where it instructed:

> [I]n determining . . . whether conditions [of confinement] are such
> as to amount to punishment, which would violate the due process
> rights of pre-trial detainees, we must ask, first, whether any
> legitimate purposes are served by these conditions, and second,
> whether these conditions are rationally related to these purposes.
> In assessing whether the conditions are reasonably related to the
> assigned purposes, we must, further, inquire as to whether these
> conditions cause inmates to endure such genuine privations and
> hardship over an extended period of time, that the adverse
> conditions become excessive in relation to the purposes assigned
> for them.

*Id.* at 992.  Thus, "a particular measure amounts to punishment when there is a

showing of express intent to punish on the part of detention facility officials, when

the restriction or condition is not rationally related to a legitimate non-punitive

government purpose, or when the restriction is excessive in light of that purpose."

*Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (quoting *Rapier v. Harris*, 172

F.3d 999, 1005 (7th Cir. 1999)). "In evaluating a pretrial detainee's claim of

unconstitutional punishment, courts must examine the totality of the circumstances

within the institution." *Id.*

The conditions that Plaintiffs complained of in this matter are fully detailed

above.  The most serious allegations are that the Defendants intentionally cut off

heat for approximately two weeks in the dead of winter when outside temperatures

were below freezing and the detainees had no winter clothing; that electricity was

cut off during the same time period; that detainees did not have a regular supply of

clean drinking water; and, that there was a deprivation of toilet paper and basic

hygiene products such as to make living conditions unsanitary, *inter alia*. (*See supra* pp. 6–10). Even Defendants acknowledge in their brief in support of their Motion to Dismiss that Plaintiffs' allegations that heat and electricity were cut off (which Defendants deny), "alone, might be sufficient to survive a motion for summary judgment." (Doc. 21, p. 19). But they assert that "when considering the totality of the circumstances and the goal of stopping the use of synthetic marijuana on RHU, the conditions were not done with an express intent to punish, and the conditions were rationally related to a legitimate government purpose." (*Id.*). That conclusion, however, cannot be drawn in addressing a motion to dismiss. Viewing all well-pled allegations in the light most favorable to the Plaintiffs, as must be does at this stage, it cannot be said that that Plaintiffs' Fourteenth Amendment claims lack facial plausibility.

Defendants' arguments that any actions taken by the Defendants were consistent with a legitimate governmental purpose are premature at this point because such an analysis would involve factual determinations inappropriate in deciding a motion to dismiss for failure to state a claim. *Dudley v. Smick*, 751 F. Supp. 3d 514, 525 (W.D. Pa. 2023) (Finding that plaintiff's allegations that he was placed in a cold cell for six days supported a reasonable inference that the conditions were "implemented as punitive measures or lacked any reasonable relationship to a legitimate governmental objective" and that at the motion to

dismiss stage, "the factual allegations alleged [were] enough to establish that the conditions Plaintiff faced, as a pretrial detainee . . . violated his substantive due process rights.").

Additionally, while Defendants accurately assert that "[c]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of atypical deprivation of prison life necessary to implicate a liberty interest" (Doc. 21, p. 18), the cases cited in Defendants' brief do not support dismissal here because "more" has been sufficiently alleged.  Defendants rely on *Smith v. Mensinger*, 293 F.3d 641, 652–53 (3d Cir. 2002), however, in *Smith*, the Plaintiff only challenged the fact of his confinement in segregation, not the conditions thereof.  The same is true of *Islaam v. Kubicki*, 838 F. App'x 657, 660 (3d Cir. 2020), *Proctor v. James*, 811 F. App'x 125, 129 (3d Cir. 2020), and *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997).  In all these cases, there were no allegations that the plaintiffs were denied "basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety." *Griffin*, 112 F.3d at 709.  Here, in contrast, those allegations have been made.

Because the pretrial detainee Plaintiffs have made sufficient allegations regarding Fourteenth Amendment violations to survive a motion to dismiss for failure to state a claim, it will be recommended that the motion be denied as to these claims.

b) <u>Count 2: Sentenced Prisoner's Conditions of Confinement</u>

Defendants Briggs and Pierre maintain that Plaintiff Patterson, who had been

sentenced, failed to plausibly plead an Eighth Amendment claim.  In *Farmer v.*

*Brennan*, 511 U.S. 825 (1994), which is perhaps the most often cited case in

addressing Eighth Amendment conditions of confinement cases, the Supreme

Court stated:

> The Constitution does not mandate comfortable prisons, but
> neither does it permit inhumane ones, and it is now settled that the
> treatment a prisoner receives in prison and the conditions under
> which he is confined are subject to scrutiny under the Eighth
> Amendment. In its prohibition of cruel and unusual punishments,
> the Eighth Amendment places restraints on prison officials, who
> may not, for example, use excessive physical force against
> prisoners. The Amendment also imposes duties on these officials,
> who must provide humane conditions of confinement; prison
> officials must ensure that inmates receive adequate food, clothing,
> shelter, and medical care, and must take reasonable measures to
> guarantee the safety of the inmates.

*Id.* at 832–33 (cleaned up).  "A claim of inhumane prison conditions may rise to

the level of an Eighth Amendment violation where the prison official deprived the

prisoner of the minimal civilized measure of life's necessities and acted with

deliberate indifference in doing so, thereby exposing the inmate to a substantial

risk of serious damage to his future health."  *Parkell v. Danberg*, 833 F.3d 313, 335

(3d Cir. 2016) (cleaned up).  "An Eighth Amendment claim against a prison

official must meet two requirements: (1) the deprivation alleged must be,

26

objectively, sufficiently serious; and (2) the prison official must have a sufficiently culpable state of mind.  In prison conditions cases, that state of mind is one of deliberate indifference to inmate health or safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001) (cleaned up).  Accordingly, "[a] prisoner asserting a claim that the conditions of confinement violate the Eighth Amendment must allege: (1) that objectively, they were 'incarcerated under conditions posing a substantial risk of serious harm;' and (2) that the defendant prison official personally knew of the substantial risk to the inmate's health or safety and failed to 'respond reasonably to the risk.'" *Jones v. Garman*, No. 1:21-CV-01715, 2024 WL 4311476, at *5 (M.D. Pa. Sept. 26, 2024), *reconsideration denied*, No. 1:21-CV-01715, 2025 WL 593906 (M.D. Pa. Feb. 24, 2025) (quoting *Farmer*, 511 U.S. at 834, 844–45).

As with the Pretrial detainee group, Patterson has made sufficient allegations regarding the conditions of confinement to survive a motion to dismiss.  Without reiterating the allegations detailed above, it is sufficient to say that the Complaint has sufficiently alleged "conditions posing a substantial risk of serious harm." *Jones*, 2024 WL 4311476, at *5.  Defendants argue that Patterson's allegations that his tablet and hygiene items were seized "do not rise to the extreme deprivation required to state a claim for constitutional violations."  (Doc. 21, p. 18).  This, however, ignores his allegations that his clothing was seized such that he was left

27

with a single short-sleeved uniform, (Doc. 1, ¶ 239), no sheets, (*id.* at ¶ 240), and

subjected to freezing temperatures.  (*Id.* at ¶ 243).  These alleged conditions, in

combination, certainly constitute a facial claim of an Eighth Amendment violation.

*See Wilson v. Seiter*, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327, 115 L. Ed. 2d 271

(1991) ("*Some* conditions of confinement may establish an Eighth Amendment

violation "in combination" when each would not do so alone, but only when they

have a mutually enforcing effect that produces the deprivation of a single,

identifiable human need such as food, warmth, or exercise—for example, a low

cell temperature at night combined with a failure to issue blankets.") (emphasis in

original).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Palakovic v. Wetzel*, 854 F.3d 209, 219 (3d Cir. 2017)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Plaintiffs have done so here.

c) Personal Involvement

Defendants Briggs and Pierre argue that as to both the pretrial detainee

group and the post-sentence prisoner(s), sufficient personal involvement on their

part was not sufficiently alleged to hold them liable under section 1983.  "A

defendant in a civil rights action must have personal involvement in the alleged

wrongs; liability cannot be predicated solely on the operation of *respondeat*

*superior*. . . . Personal involvement can be shown through allegations of personal

direction or of actual knowledge and acquiescence.  Allegations of participation or
actual knowledge and acquiescence, however, must be made with appropriate
particularity."  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Here, Plaintiffs have alleged both direct participation and actual knowledge
and acquiescence.  At Paragraph 68 of the Complaint, they allege: "On information
and belief, Defendants Warden Briggs and Deputy Warden Pierre directed DCP
staff to seize the tablets and were fully aware of the operation." At Paragraph 78
they allege, again on "information and belief," that Defendants Briggs and Pierre
"directed staff to conduct the search and seizure" of all Plaintiffs' personal
belongings.  Regarding the most serious allegation, they state, "Correctional
officers told people held on P-6 that the order to cut power had come directly from
Warden Briggs."  (Doc. 1, ¶ 100).  At Paragraph 101 they aver, "On information
and belief, Defendant Deputy Warden Pierre participated in, was fully aware of,
and agreed with Defendant Warden Briggs's decision to cut the power."  The
Complaint, taken as a whole, makes sufficient allegations to support a theory of
liability based on more than a theory of *respondeat superior*.

Defendants also make much of the fact that many, but not all, of the
allegations in the Complaint are based on "information and belief."  As the Third
Circuit explained in *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263 (3d Cir.
2016):

29

> . . . insinuating that the Federal Rules of Civil Procedure do not
> permit facts pleaded upon information and belief to serve as the
> sole basis for relief—is plainly incorrect. This Court has explained
> that pleading upon information and belief is permissible where it
> can be shown that the requisite factual information is peculiarly
> within the defendant's knowledge or control—so long as there are
> no boilerplate and conclusory allegations and plaintiffs . . .
> accompany their legal theory with factual allegations that make
> their theoretically viable claim plausible. In fact, this Court has
> explained that several Courts of Appeals accept allegations on
> information and belief when the facts at issue are peculiarly within
> the defendant's possession.

*Id.* at 267–68 (cleaned up). While Plaintiffs have alleged enough to "nudge" the

claims that Briggs and Pierre had enough of a hand in the "blackout" and

accompanying conditions to move the claim that they participated in, approved or

had knowledge of, and acquiesced in those conditions "across the line from

conceivable to plausible," that is not to say that Defendants' arguments are without

merit. However, it would be premature to foreclose Plaintiffs' claims at this stage

in the litigation. If appropriate, Defendants' arguments may be raised on a

summary judgment motion.

Accordingly, it will be recommended that the Defendants' motion to dismiss

as to the Fourteenth Amendment claims of the pretrial detainees and the Eighth

Amendment claims of the post sentence Plaintiff(s)' conditions of confinement

claims (Plaintiffs' First and Second Causes of Action) be denied.

### 3. Counts 3 and 4: Claims Involving Mental Health

The Third Cause of Action in the Complaint is brought by Plaintiffs Little, Ramos, and the putative mental health class against Dauphin County under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.  The Fourth claim is brought by the same Plaintiffs, also against Dauphin County, pursuant to the Rehabilitation Act 29 U.S.C. § 794.[9]  In support of both claims, Plaintiffs assert that Plaintiff Little suffers from anxiety and depression and that Plaintiff Ramos suffers from schizophrenia and depression.  Both Plaintiffs allege that they are medicated for those conditions.  They further allege that their medication was administered inconsistently.  (*See* Doc. 1 at ¶ 148: "During the blackout, DCP staff did not administer Mr. Little's psychiatric medications consistently;" ¶ 211 "Mr. Ramos also did not receive his medication regularly during the blackout.").  They further allege that the removal of their tablets denied them access to "mental health resources."  (Doc. 1, ¶ 72).  Additionally, Plaintiffs argue the alleged blackout conditions (which included lack of light and heat) prolonged isolation, and lack of hygiene products exacerbated their mental health conditions.  In their opposition brief, Plaintiffs argue: "Defendants subjected individuals with disabilities to the

---

[9] Consistent with Third Circuit law, the parties agree that "the substantive standards for determining liability [under both Acts] are the same." *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 288 (3d Cir. 2019) (quoting *McDonald v. Com. of Pa., Dep't of Pub. Welfare Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995)).

extreme conditions of the blackout and deprived them of tablets—tools that, for

many, provided the only available means of accessing mental health treatment

materials aside from medication.  In doing so, DCP engaged in an 'outright denial'

of critical medical and mental health services, not merely substandard care."  (Doc.

26, p. 33).  They further assert that "imposing freezing cold and dark conditions,

restricting Plaintiffs' freedom of movement to solely within their cells, and

depriving Plaintiffs of basic hygiene, Defendants failed to provide the

'fundamentals' necessary for accommodating disabilities."  (*Id.*).  Defendants, in

contrast, maintain "Plaintiffs do not allege, because they cannot, that any action by

the County was taken to exclude them from any benefit because of their disability.

Likewise, Plaintiffs do not allege that they were treated differently than other

inmates housed on RHU without a disability."  (Doc. 21, p. 35).

This Court recently summarized the standards applicable under the ADA and

the RA in *Zandt v. Dep't of Corr.*, No. 3:24-CV-486, 2024 WL 5248253 (M.D. Pa.

Dec. 30, 2024):

> Under Title II of the ADA, "no qualified individual with a
> disability shall, by reason of such disability, be excluded from
> participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by
> any such entity." 42 U.S.C. § 12132. To establish a claim under
> Title II of the ADA, a plaintiff must allege that: "(1) he is a
> qualified individual with a disability; (2) he was either excluded
> from participation in or denied the benefits of some public entity's

services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *McPherson v. County of Dauphin*, No. 19-1865, 2020 WL 1558206, at *2 (M.D. Pa. Mar. 24, 2020). The RA requires the same showing but applies only to "any program or activity receiving Federal financial assistance" and requires a plaintiff to demonstrate that their disability was the sole reason for the discrimination, not merely one reason. 29 U.S.C. § 794(a); *CG v. Pa. Dep't Educ.*, 734 F.3d 229, 235–36 (3d Cir. 2013).

 "[D]ecisions about a prisoner's medical treatment generally do not give rise to a claim under the ADA." *Nunez v. Prime Care Health, Inc.*, No. 19-CV-859, 2019 WL 1400466, at *1 n.3 (E.D. Pa. Mar. 27, 2019) (collecting cases). These claims would inevitably fail because the ADA and RA "prohibit[ ] disability-based discrimination, 'not inadequate treatment for the disability.'" *Kokinda v. Pennsylvania Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016) (quotation omitted). However, a plaintiff may demonstrate a cognizable claim under the ADA and the RA if they allege a disabled detainee was denied a reasonable accommodation that would have granted them meaningful access to prison activities and programs, including those that implicate medical care. *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 439 (E.D. Pa. 2020), *aff'd*, No.21-1019, 2021 WL 6101246 (3d Cir. Dec. 21, 2021).

*Id.* at *8–9.

Little alleges to suffer from anxiety and depression and Ramos alleges to suffer from schizophrenia and depression.  For purposes of this motion, they must be considered "qualified individuals with a disability" covered by each Act.  *See Disability Rts. New Jersey, Inc. v. Comm'r, New Jersey Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) ("mental illness qualifies as a disability under the statute." (citing § 12102(1)(A).).  Plaintiffs' claims of denial of access to and

participation in DCP's services, programs, or activities can be divided into two parts.  First, they allege denial of access to mental health treatment because their medications were inconsistently administered and that the only form of mental health services was through the tablets that were confiscated.  Second, they assert that the combined effects of the "blackout" and harsh conditions in the RHU negatively impacted their mental health conditions.

Regarding their claim about psychiatric medication and services, Plaintiffs acknowledge that "the ADA prohibits discrimination based on disability—it does not merely provide a cause of action for inadequate treatment," (Doc. 26, p. 32), but they argue that an outright denial of services is actionable.  Plaintiffs cite to *McPherson v. Cnty. of Dauphin*, No. 1:19-CV-01865, 2020 WL 1558206 (M.D. Pa. Mar. 24, 2020) in support of this contention.  In *McPherson*, the county prison refused to provide the plaintiff with any medication despite having been repeatedly informed of his specific need for bipolar medication and his medication having even been delivered to the prison.  The Court drew a distinction between inadequate medical care and the denial of access to prescription medication and found that alleging such an outright denial stated an actionable claim under the ADA.  *Id.* at * 3–4.  *See also Tipton v. Schultz*, No. 2:24-CV-00156, 2025 WL 790749, at *10 (W.D. Pa. Feb. 14, 2025), *report and recommendation adopted*, No. 2:24-CV-0156, 2025 WL 786489 (W.D. Pa. Mar. 12, 2025) (collecting cases).

34

This, however, is not the case here.  As noted above, Plaintiffs have alleged that they were receiving medication, although at times doses were missed or given at the wrong times.  These allegations fall within the ambit of inadequate care as opposed to the outright denial of medication.  As pled, the allegations do not support a theory of liability as described in *McPherson*.  Similarly, Plaintiffs' allegations regarding the confiscation of their tablets do not support a claim that they were completely denied access mental health services.  The Complaint fails to allege what mental services would been available to Plaintiffs had they had access to their tablets.  Even the most liberal reading of the Complaint fails to connect the denial of tablets to a denial of mental health services.  As already noted, Plaintiffs admit that they were receiving psychiatric medication.  Additionally, Plaintiff Little alleged that "[o]n or around December 8, 2023, Mr. Little was being escorted back to his cell on P-6 after seeing the medical unit."  (Doc. 1, ¶ 153).  Given that Plaintiffs were receiving medication and, at least on one occasion, there was a medical visit during the relevant three-month timeframe, it cannot be said that the Complaint alleges a complete denial of medical and/or mental health services.

Plaintiffs also maintain that the allegation regarding the "blackout conditions" states a viable claim for failure to provide reasonable accommodations under the ADA and the Rehabilitation Act.  They argue "by imposing freezing cold and dark conditions, restricting Plaintiffs' freedom of movement to solely within

their cells, and depriving Plaintiffs of basic hygiene, Defendants failed to provide the 'fundamentals' necessary for accommodating disabilities." (Doc. 26, p. 33). Plaintiffs cite *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285 (3d Cir. 2019) in support of their position. In *Furgess*, the plaintiff was a Pennsylvania state inmate who suffered from "myasthenia gravis (MG), a neuromuscular disease that inhibit[ed] his ability to see, walk, speak, and lift." *Id.* at 287–88. When he first arrived at SCI Alboin, he requested and was given accommodations for his disability which included an accessible shower stall near to his cell. *Id.* at 288. He was later placed in the RHU which did not have an accessible shower. Despite the prison being well aware of his needs, he was not provided access to an accessible shower and consequently was unable to shower for over three months. *Id.* When prison officials finally gave him shower access, he fell and suffered permanent injuries. *Id.* He brought suit under the ADA and the Rehabilitation Act. The district court dismissed the action, finding that "showers are not a program, service, or activity," which the Court of Appeals held was "contrary both to the statutory language of the RA and the ADA and to the weight of case law." *Id.* at 289. The Court of Appeals explained:

> The ADA does not define "services, programs, or activities," but both Congress and this Court have recognized that Title II provides at least the same degree of protection as Section 504. Thus, the phrase "service, program, or activity" under Title II, like "program or activity" under Section 504, is extremely broad in

36

scope and includes anything a public entity does. A prison's provision of showers to inmates fits within this expansive definition, as it undoubtedly is something "a public entity does" and is one "of the operations" of the prison.

Indeed, Department of Justice guidance on Title II regulations explicitly refers to a prison's provision of hygiene as being included under the statute's purview. Specifically, the DOJ explains that corrections systems are unique facilities under Title II because inmates cannot leave, and thus prisons must address the needs of inmates with disabilities by providing accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities.

*Id.* at 289–90. (cleaned up). Having found that access to showers was indeed a covered program or activity, the Court turned its analysis to whether Furgess suffered discrimination *because of* his disability. The Court rejected the DOC's argument that the reason that he was denied an accessible shower was his misconduct which resulted in his placement in the RHU—not his disability. The Court found "[a]s to causation, the sole cause of Furgess's deprivation of a shower was his disability." *Id.* at 291. In the *Furgess* case, the Plaintiff suffered a neuromuscular disease that inhibited his ability to see, walk, speak, and lift; therefore, he needed an accessible shower. The accommodation was necessary due to his disability, and his disability alone. The prison knew of his needs yet denied him an accessible shower.

Here, however, the allegations are more nebulous. Plaintiffs allege that the "blackout" and other harsh conditions failed to accommodate their disabilities.

37

They conclude "Plaintiffs have sufficiently alleged they are qualified individuals with disabilities, were excluded from programs, services, and activities at DCP, and that this exclusion was the result of the failure of DCP to provide reasonable accommodations for their disabilities." (Doc. 26, p. 34). This Court has detailed the pleading requirements to establish that an exclusion, denial of benefits, or discrimination *was by reason of disability* in *Zandt*, *supra*, as follows:

> To meet his burden as to prong three of his ADA and RA claims, Plaintiff must also allege "facts sufficient to show" that [Plaintiff] had been excluded from reasonable accommodations "by reason of" his disability. *Brown v. Pa. Dep't of Corr*., 290 F. App'x 463, 467 (3d Cir. 2008) (quoting 42 U.S.C. § 12132). The Third Circuit has held that showing that an accommodation has been denied "by reason of" a disability means showing that the disability "played a role" in the decision-making process. *See CG* [*v. Pennsylvania Dep't of Educ.*], 734 F.3d at 236 n.11 (affirming a district court's bench trial judgment and noting that a plaintiff can show an ADA violation "so long as disability 'played a role in the . . . decision making process and . . . had a determinative effect on the outcome of that process.'") (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir.2007)). However, under the RA, disability must be the sole cause of the decision. See *CG*, 734 F.3d at 236 n.11.

*Zandt*, 2024 WL 5248253, at *10 (M.D. Pa. Dec. 30, 2024).

Because the allegations in the Complaint regarding mental health services go more to a claim of inadequate care than to a denial of mental health medication/medical care, and because there is no discernable connection between allegations regarding the denials resulting from the "blackout" and the Plaintiffs'

alleged disabilities, those claims should be dismissed without prejudice and leave to amend granted.  *See Zandt*, 2024 WL 5248253, at *10 ("The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile" (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002))).

### 4.  Counts 5 and 6: Claims Involving Exercise of Religion

Plaintiffs claim that they were denied the ability to freely practice their religion because they had no access to religious texts, scripture, the Bible, or religious guidance.  (*See, e.g.*, Doc. 1, ¶¶ 74, 296–97).  They bring these claims in two separate causes of action, *viz.*, a section 1983 First Amendment Free Exercise claim (the Fifth Cause of Action) and a claim pursuant the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et seq. (Sixth Cause of Action).  These claims will be addressed in reverse order in which they are enumerated in the Complaint.

#### a)  Count 6: Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc et seq.

Plaintiffs' Sixth Cause of Action is a claim against Defendant Dauphin County under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc et seq.  They allege that "Defendant Dauphin

39

County's acts, omissions, policies, and/or customs substantially burdened Plaintiffs' and class members' religious exercise by denying them the ability to access religious materials or congregate for religious purposes." (Doc. 1, ¶ 310). Defendants respond by denying that Dauphin County imposed a substantial burden on Plaintiffs' religious exercise and that the complained of actions (removing tablets from the RHU and limiting congregation) furthered the compelling government interest of maintaining safety and security. (Doc. 21, p. 23). Prior to outlining the requirements to plead a cause of action under RLUIPA, Plaintiffs' allegations regarding this claim will be briefly reiterated. Plaintiff Little alleges that he is "is a devout and practicing Christian. His religious practice includes praying and reading scripture on a daily basis." (Doc. 1, ¶ 134). He claims his tablet was taken for approximately three months. (*Id.* at ¶ 136). He alleges that without his tablet he was unable to practice his Christianity, because "it is the only way to access the Bible or other prayer guidances [sic], and DCP does not offer any in-person church or chaplain services." (*Id.* at ¶ 137).

Plaintiff Ramos states that he "has been a Christian since he was a young child. His religious practice involves a daily practice of reading scripture, praying, and listening to sermons." (*Id.* at ¶ 185). Ramos was never given a tablet. (*Id.* at ¶¶ 187–89). He claims that without a tablet, he "was unable to access any religious materials." (*Id.* at ¶ 190). He claims this deprivation lasted two months. (*Id.* at ¶

40

191).  Lastly, Plaintiff Patterson also alleges that he is a devout and practicing

Christian.  As part of his faith, "he regularly reads the Bible and engages in prayer

upon waking and before meals."  (*Id.* at ¶ 222).  He alleges a deprivation of a tablet

for a little over a month and that without a tablet, he "was unable to access any

religious services, including any ability to read scripture or follow prayer

guidance."  (*Id.* at ¶¶ 223–24).  These specific allegations cannot, however, be read

in a vacuum: they follow 16 pages of allegations that essentially assert, relevant to

this claim, that for varying periods of time those confined in the RHU had no texts

of any kind (including religious texts) and no access to "in-person" religious

services or means of receiving them.  The gist of their complaint is that if they

wanted access to religious scripts, the Bible, texts, or guidance, it could only be

obtained through the tablet.  They also claim that their religious practices involve

reading scripture.

In *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007), Court of Appeals

for the Third Circuit clearly laid out the burden shifting structure employed to

analyze a claim under RLUIPA:

> Section 3 of RLUIPA states that "[n]o government shall impose a
> substantial burden on the religious exercise of a person residing in
> or confined to an institution . . . even if the burden results from a
> rule of general applicability," unless the government demonstrates
> that the burden is "in furtherance of a compelling governmental
> interest" and is "the least restrictive means of furthering that . . .
> interest." 42 U.S.C. § 2000cc–1(a). If the plaintiff "produces

> prima facie evidence to support a claim alleging a [RLUIPA]
> violation . . . the government shall bear the burden of persuasion
> on any element of the claim, except that the plaintiff shall bear the
> burden of persuasion on whether [the challenged practice or law]
> substantially burdens the plaintiff's exercise of religion." *Id.* §
> 2000cc–2(b). For the purposes of RLUIPA, "government"
> includes any official of a "State, county, municipality, or other
> governmental entity created under the authority of a State," as well
> as any other person "acting under color of State law." *Id.* §
> 2000cc–5(4)(A).

*Id.* at 277. Plaintiffs bear "the burden to show that a prison institution's policy or

official practice has substantially burdened the practice of that inmate's religion."

*Id.* at 277–28. In determining whether a prison policy "substantially burdens" the

practice of an inmate's religion, the Court of Appeals adopted the following

disjunctive test: "[f]or the purposes of RLUIPA, a substantial burden exists where:

1) a follower is forced to choose between following the precepts of his religion and

forfeiting benefits otherwise generally available to other inmates versus

abandoning one of the precepts of his religion in order to receive a benefit; OR 2)

the government puts substantial pressure on an adherent to substantially modify his

behavior and to violate his beliefs." *Id.* at 280. If that burden is met, "the burden

shifts to the [defendant] to show that the policy is in furtherance of a compelling

governmental interest and is the least restrictive means of furthering this interest."

*Id.* at 283 (citing 42 U.S.C. § 2000cc–1(a)).

In establishing a claim that their religious practices were substantially burdened by the practices in the RHU, Plaintiffs argue that they were "deprived of all religious texts and denied access to any form of religious services for at least one month, and in some cases up to three months . . . and that . . . electronic tablets are the sole mechanism through which incarcerated individuals can . . . engage in religious practices, including reading sacred texts and attending religious services." (Doc. 26, p. 28–29). They further maintain that "[a]t the time of the deprivation, DCP did not offer any in-person religious services or chaplain support." (*Id.* at 29). As indicated above, Defendant argues that these alleged conditions do not mount to a substantial burden on the ability of plaintiffs to practice their religion. As to Plaintiff Patterson, they argue he has not "plausibly plead [sic] that he lacked an alternative means of exercising his religious freedom as he did not claim that he was prohibited from praying upon waking or before meals." (Doc. 29, p. 13). As to Ramos, Defendants assert that he was not given a tablet due to an insufficient number of tablets and not out of a motive to restrict his religious freedom. (Doc. 29, p. 13). Defendants argue that "Plaintiffs offer no legal support for their argument that a prison must provide an inmate with access to sermons . . . [and that] Ramos does not plausibly plead that he was prohibited from praying daily, or that his alleged lack of access to "scriptures" or "sermons" was so essential to his religious practice that he lacked an alternative method of exercising his right." *Id.*

43

They further maintain that "Little does not plausibly plead that he was prohibited from praying daily, or that his alleged lack of access to the Bible or prayer guidance was so restrictive that he lacked an alternative method of exercising his right." (*Id.* at 13–14). Viewed in isolation, these arguments are not incorrect; however, the broader allegation, the gravamen, of Plaintiffs' Complaint is missed. Plaintiffs say that not only is reading scripture (the Bible) and religious texts a part of their religion, but being denied to the ability to do so has the practical effect of denying Plaintiffs the ability to practice their religion. According to the Complaint, these restrictions substantially burden their religious practice. Accordingly, Plaintiffs have pled a claim consistent with the essence of the teaching of *Washington v. Klem*, *supra*. 97 F.3d 282–23.

Additionally, Defendants attempt to justify any policy or practice as being in furtherance of a compelling governmental interest, prison safety, and security. (Doc. 21, p. 28–29). However, on a motion to dismiss, Defendant cannot meet its burden to show that its policies were "in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest" through an argument in a brief. *See Robertson v. Biby*, 647 F. App'x 893, 897–98 (10th Cir. 2016). On a motion for summary judgment, the Defendant would be required to show how removing tablets was indeed the least intrusive means to stop the use of synthetic marijuana at the facility.

44

Because Plaintiffs have pled a *prima facie* case under the Religious Land Use and Institutionalized Persons Act of 2000, it will be recommended that the motion to dismiss be denied as to that claim.

### b) Count 5: Free Exercise of Religion in Violation of 42 U.S.C. § 1983

Plaintiffs' fifth cause of action brings a section 1983 claim alleging a violation of their rights to freely practice their religion as guaranteed by the First Amendment. This claim is brought by all Plaintiffs (and the putative class) against Defendants Briggs and Pierre. Although "RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates," *McFaul v. Valenzuela*, 684 F.3d 564, 575 (5th Cir. 2012) (quoting *Mayfield v. TDCJ*, 529 F.3d 599, 612 (5th Cir.2008)), the factual basis for and the legal arguments in support of and against the claim by both parties are essentially the same as discussed above. Without unnecessarily reiterating ground already covered, addressing the First Amendment claim requires a decision as to whether a *prima facie* case can be met when the allegations are that Plaintiffs were completely denied access to any religious services, materials, scripts such as the Bible, et cetera when part of the practice of their religion involves reading religious texts. Furthermore, it must be decided whether prison security and safety justify

the measures taken and whether sufficient involvement on the part of Briggs and Pierre has been alleged. These last two issues have already been sufficiently addressed above. Whether the restrictions imposed in the RHU during the relevant time period served a legitimate governmental purpose is best decided on a motion for summary judgment. As discussed above and taking their allegations as true, Plaintiffs have sufficiently alleged that the direction to remove all items from inmates' cells either came directly from Briggs and Pierre, or, they knew of the direction and acquiesced to it.

This leaves the issue of whether allegations of a deprivation of religious materials and services from a period of one to three months states a First Amendment claim. "The mere assertion of a religious belief does not automatically trigger First Amendment protections, however. To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000).

Plaintiffs have alleged enough to trigger First Amendment protections: they claim to be devout Christians whose religious practice includes reading scripture. In *Negrete v. New Jersey*, No. 19-18480, 2022 WL 17324929 (D.N.J. Nov. 29, 2022), the Court applied the 12(b)(6) standard in the preliminarily screening of a section 1983 claim that the Plaintiff's First Amendment Rights were violated by having been denied a copy of the Quran while in administrative segregated

46

housing.  In allowing the claim to proceed, the Court adopted the following

reasoning:

> "[D]enying prisoners access to their holy text . . . is a substantial burden on free-exercise rights." *Garner v. Muenchow*, 715 F. App'x 533, 536 (7th Cir. 2017) (citing *Sutton v. Rasheed*, 323 F.3d 236, 253–57 (3d Cir. 2003) ("[W]hile we believe that a Christian inmate could practice his religion generally even if prevented from attending Christmas or Easter services, we do not believe he could practice his religion if deprived of access to the Bible.") and *Kay v. Bemis*, 500 F.3d 1214, 1229 (10th Cir. 2007)); *see also Blankenship v. Setzer*, 681 F. App'x 274, 277 (4th Cir. 2017) (holding 10-day deprivation of Bible during transport from state prison to county jail substantially burdened inmate's religion); *Tarpley [v. Allen Cty., Ind.*, 312 F.3d [895,] [ ] 899 [(7th Cir. 2002)] (observing that providing inmate a copy of the jail's Bible "offered him the essential material for his religious studies").

*Id.* at *11 (quoting *Wells v. Hendrix*, No. 20-1065, 2022 WL 19415, at *9 (S.D. Ind.

Jan. 3, 2022)).

Accordingly, Plaintiffs' allegations that they are devout Christians whose

religious practices require reading scripture and that they were denied not only any

access to religious scripts but also any form of religious services, state a cognizable

claim that should not be dismissed at this stage.

That having been said, "an inmate only 'retains those First Amendment

rights that are not inconsistent with his status as a prisoner or with the legitimate

penological objectives of the corrections system.'" *Payne v. Doe*, 636 F. App'x

120, 123 (3d Cir. 2016) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct.

2800, 41 L.Ed.2d 495 (1974)). As explained in *Pell*:

> To determine whether a regulation infringing upon constitutional rights is reasonable, courts apply the four factors set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). These factors require courts to consider: (1) whether the regulation bears a 'valid, rational connection' to a legitimate and neutral government objective; (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives." *Id.* at 89–90, 107 S.Ct. 2254 (citations omitted).

Defendants argue that nothing that Plaintiffs allege would prevent them from

practicing their religion by praying in their cells, and Plaintiffs allege that prayer is

part of their practice. Additionally, Defendants argue that the restrictions imposed

were valid and furthered a legitimate governmental interest. While application of

the *Turner* factors may turn in Defendants' favor, that determination cannot be

made on the record currently before the Court. Dismissal of these claims would

not be appropriate at this stage, and therefore the Motion to Dismiss as to Count 5

should be denied.

### 5. Count 7: Municipal Liability

Plaintiffs' Seventh Cause of Action is claim of municipal liability against Dauphin County.  The allegations against Dauphin County read, in their entirety, as follows:

> The Dauphin County Jail Oversight Board and its municipal policymakers were aware of and deliberately indifferent to Defendant Warden Briggs' imposition of a blackout and punitive deprivations on RHU residents during the relevant time period, demonstrating its acquiescence in and tacit ratification of those actions.
>
> By failing to adequately discipline and supervise the warden and other prison administrators who engaged in such misconduct or instruct prison administrators to immediately cease the constitutional violations, Dauphin County was deliberately indifferent to the constitutional rights of its citizens, including Plaintiffs and other members of the class.
>
> By any and/or all of these means, Defendant Dauphin County caused the violations of Plaintiffs' and class members' Fourteenth, Eighth, and First Amendment rights set forth in the First, Second, and Fifth Causes of Action above.
>
> As a result, Plaintiffs and other members of the Class suffered the alleged damages.

(Doc. 1, ¶¶ 315–18).

Defendants argue that these allegations do not sufficiently plead a claim for municipal liability.  They characterize the allegations as simply conclusory statements that constitute a "formulaic recitation of a *Monell* claim."  (Doc. 21, p. 34).  Plaintiffs counter that they have sufficiently alleged that the County had knowledge of or acquiesced in the complained of actions and/or agreed to the

agreed constitutional violations after they occurred.  (Doc. 26, pp. 34–35).  Further,
Plaintiffs point to background allegations made in the Complaint that describe
"well-known and documented problems" at DCP that existed prior to the
"blackout" or other conditions alleged in the Complaint.  (*Id.* at p. 35).

"A municipality may be liable if it violated a plaintiff's constitutional rights
(1) through 'a policy, ordinance, regulation or officially adopted decision that has
been promulgated by the municipality's officers,' (2) through action taken by an
official with final policymaking authority, or (3) through 'governmental custom
even though such custom has not been formally approved.'"  *Frazier v. City of
Philadelphia*, 441 F. Supp. 3d 76, 94 (E.D. Pa. 2020) (quoting *Brennan v. Norton*,
350 F.3d 399, 427 (3d Cir. 2003).  "To plead a municipal liability claim, a plaintiff
must allege that a local government's policy or custom inflicted the injury in
question.  Policy is made when a decisionmaker possessing final authority to
establish municipal policy with respect to the action issues an official
proclamation, policy, or edict."  *Est. of Roman v. City of Newark*, 914 F.3d 789,
798 (3d Cir. 2019) (cleaned up).  "Custom, on the other hand, can be proven by
showing that a given course of conduct, although not specifically endorsed or
authorized by law, is so well-settled and permanent as virtually to constitute law."
*Id.*  Municipal liability "exist[s] where authorized policymakers approve a
subordinate's decision and the basis for it."  *Brennan*, 350 F.3d at 427.

While Defendants argue that Plaintiffs' allegations that it was aware of and acquiesced to the alleged "blackout" and other conditions in the RHU during the relevant time are relatively bareboned and conclusory, they are, nonetheless, sufficient to survive a motion to dismiss. Accordingly, it will be recommended that the Motion to Dismiss this claim be denied.

### 6. Count 8: Fourteenth Amendment Claims of Excessive Force in Violation of 42 U.S.C. § 1983

The final claim brought in the Complaint (Cause of Action Eight) is an excessive force claim against Defendants Pierre, Lucas, Skelton, and John Does #1-12 brought by Plaintiff Kani Little. The allegations supporting this claim were summarized above as follows:

> [Plaintiff] also alleges having been assaulted by multiple guards while confined in the RHU. (Doc. 1, p. 22). He asserts that on December 8, 2023, while being escorted to his cell after being seen at the medical unit, he complained to the guard about the alleged "extreme deprivations" that he and his fellow inmates were suffering. (*Id.* at ¶¶ 153–54). He states that in protest of the RHU conditions, he refused to be locked in his cell. (*Id.* at ¶ 156). The Complaint alleges that while he was standing outside his cell, he was approached by Defendants Lieutenant Mark Skelton, Custody Major Roger Lucas, and Deputy Warden Lionel Pierre, who turned a deaf ear to his request for better conditions. (*Id.* at ¶¶ 159–61). Plaintiff alleges that after the conversation, while handcuffed to a belt around his waist, he was made to face the wall and assaulted by 12 guards in riot gear (John Doe Defendants 1–12), who smacked him with riot shields and threw him to the ground. (*Id.* at ¶¶ 162–64). Plaintiff avers that he was knocked unconscious and woken up with mace sprayed in his face, only to be carried to

Block P-3, stripped, and beaten and maced again. (*Id.* at ¶¶ 167–71). He alleges that the purported first assault occurred in the presence of Defendants Pierre, Lucas, and Skelton, and the second assault was in the presence of Defendants Lucas and Pierre, and that on both occasions, none of these defendants did anything to intercede. (Doc. 1, p. 20). Little complains that he received inadequate medical care after the incident and that he still suffers nerve damage as a result of the alleged assault. (*Id.* at p. 21).

*See supra* III.B.1., at 10–11.

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "[S]uch punishment can consist of actions taken with an expressed intent to punish . . . in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Id.* at 398 (cleaned up). A pretrial detainee asserting an excessive force claim "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 194 (3d Cir. 2021) (quoting *Kingsley*, 576 U.S. at 396–97). Assessment of whether the force used was objectively unreasonable "requires 'careful attention to the facts and circumstances of each particular case.'" *Id.* at 194 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Those circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the

officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Id.* at 194–95 (quoting *Kingsley*, 576 U.S. at 397).

Defendants argue that the Complaint fails to allege that Pierre or Lucas used any force against the Plaintiff and they cannot be held liable on a theory of *respondeat superior*. While it is correct that liability cannot be imposed on that theory, here the Complaint does allege that "Defendants Pierre, Lucas, and Skelton personally directed and/or authorized the use of objectively unreasonable force against Plaintiff Little." (Doc. 1, ¶ 321). Plaintiff further alleges that when he was purportedly assaulted by approximately twelve guards in riot gear, Pierre, Lucas, and Skelton took no action to intercede on two separate occasions. (Doc. 1, ¶¶ 167, 172).

"A corrections officer who witnesses but fails to intervene in the beating of an inmate by other officers is culpable if the officer had a 'reasonable opportunity' to intervene but refused to do so." *Ortiz v. Cumberland Cnty. Freeholders*, No. CV 21-19953, 2024 WL 4275003, at *5 (D.N.J. Sept. 24, 2024) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 587 (3d Cir. 2004); *see also Smith v. Mensinger*, 293 F.3d 641, 652 (3d Cir. 2002) ("if [Plaintiff] can show at trial that an officer attacked him while [Defendants] ignored a realistic opportunity

to intervene, he can recover."). Plaintiff is not proceeding on a theory of *respondeat superior*; he has alleged enough personal involvement against these Defendants to allow the claim to proceed.

Additionally, Defendants argue that "even if Pierre or Lucas ordered corrections officers to respond to address Little's refusal to enter his cell (Plaintiffs do not disagree that Little was actively refusing to obey a command to enter his cell to "lock up") the alleged order was appropriate given the need for the use of force to gain Little's compliance." (Doc. 29, p. 20). They cite the allegations in the Complaint that Little failed to get into his cell as directed and refused to get on his knees and argue that Little's actions in failing to obey lawful orders created a security risk. (*Id.*). Defendants argue that the "circumstances that necessitated the use of force are taken from Plaintiffs' Complaint." (*Id.* at 17). However, concluding that any actions taken were objectively reasonable would indeed require the Court to resolve factual issues based only on the pleadings. The type of analysis described in *Jacobs v. Cumberland Cnty.*, *supra*, cannot be done at this stage. Plaintiff Little has alleged enough to state a claim for excessive force against moving Defendants.

## V. Recommendation

Based on the foregoing, it is respectfully recommended that:

1) Defendants' request to deny class certification be **DENIED**;

2) Defendant's Motion to Dismiss Plaintiffs' claims under the Americans with Disabilities Act and the Rehabilitation Act be **GRANTED, in part**, and those claims be dismissed without prejudice and the Plaintiffs be granted leave to file an amended complaint; and

3) Defendants' Motion to Dismiss be **DENIED** as to all remaining claims.

Dated: August 5, 2025                     **/s/ Leo A. Latella**
                                          Leo A. Latella
                                          United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

KANI LITTLE, *et al.*

Plaintiffs,

v.

DAUPHIN COUNTY, *et al.*,

Defendants.

CIVIL ACTION NO. 4:24-CV-2169

(Judge Mehalchick)

(Magistrate Judge Latella)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the

forgoing **Report and Recommendation** dated August 5, 2025.

Any party may obtain review of the Report and Recommendation pursuant

to Local Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may

consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Dated: August 5, 2025

**/s/ Leo A. Latella**
Leo A. Latella
United States Magistrate Judge